# ORIGINAL

FILED

NOV 3 2010

U.S. COURT OF
FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GADSDEN INDUSTRIAL PARK, LLC,

    Plaintiff,

v.

THE UNITED STATES OF AMERICA,

    Defendant.

:   Civil Action No.

# 10-757 L

## COMPLAINT

AND NOW comes Plaintiff, Gadsden Industrial Park, LLC ("GIP"), by and through its undersigned counsel, and hereby sets forth its Complaint in Civil Action against the United States of America for just compensation pursuant to the Fifth Amendment of the United States Constitution, and in support thereof avers as follows:

### Parties & Jurisdiction

1.    GIP is a Delaware limited liability company with its primary place of business at 174 South 26th Street, Gadsden, AL 35904.

2.    Defendant is the United States of America acting through its lawfully authorized employees, agents and agencies, including the Environmental Protection Agency ("EPA").

3.    GIP's claims arise under the Tucker Act, 28 U.S.C. § 1491 and the just compensation clause of the Fifth Amendment to the Constitution of the United States. This Court has jurisdiction over such claims under 28 U.S.C. § 1491 (a)(1).

### Factual & Procedural Background

4.    On or about July 1, 1999, Gulf States Steel, Inc. of Alabama ("GSS"), the owner and operator of a steel mill located in Gadsden, Alabama, filed a bankruptcy petition in the

United States Bankruptcy Court for the Northern District of Alabama, Eastern Division (the "Bankruptcy Court"), under Chapter 11 of the Bankruptcy Code, which was assigned case number 99-11958-ISS (the "Bankruptcy Action"). The case was subsequently converted to one under Chapter 7 and James Henderson was appointed Chapter 7 trustee (the "Trustee") for the Estate.

5.     Pursuant to bidding procedures established by the Bankruptcy Court, GIP submitted a $6.3 million bid for "approximately 600 acres of real property on which [GSS'] former steel operations were located (carving out from the real property to be purchased, among other real property, the real property underlying the coke ovens and melt shop) and substantially all of [GSS'] remaining fixtures, plant and equipment (including the plate mill, the hot roll mill, and the cold roll mill)" (the "Steel Mill Assets").[1] See Findings of Fact and Conclusions of Law and Order Granting Trustee's Motion for an Order Authorizing Sale of Property on the Estate Free and Clear of Liens and Other Interests, attached hereto as Exhibit A, ¶10.

6.     GIP specifically excluded certain items (the "Retained Property") from its bid for the Steel Mill Assets, as more particularly identified in the Trustee's Bill of Sale, attached hereto as Exhibit B.

7.     While the Retained Property was to remain with GSS' estate, GIP's bid specifically included the following option as one of the assets that would be acquired by GIP if its bid was accepted:

> By-product of manufacturing including but not limited to Kish and miscellaneous other materials and assorted scrap which are located on the real property purchased by [GIP] from [the Trustee] by deed of even date herewith.

---

[1] As evidenced by the Trustee's Bill of Sale, GIP's purchase included the landfill where the Kish that is the subject of this lawsuit is located.

The option for [GIP] herein to take title to such portion or all of such items shall be exercisable by Purchaser by its taking actual physical possession of such items or otherwise evidencing its intent to be the owner thereof.

With respect to any such by-products or other items which are not located on the real property purchased by Purchaser by deed of even date herewith, by [sic] on other property of Seller retained by Seller (hereinafter the "Retained Property"), Purchaser shall have an option to take title to such portion or all of such items, which option shall be exercisable by Purchaser by its taking actual physical possession of such by-products or other items and removing same from the Retained Property, its successors or assigns.

Purchaser shall be vested with title to such items at such time as they are physically removed from the said Retained Property, and if not removed by Purchaser from said Retained Property, shall remain the property of Seller. Purchaser shall have ten (10) years from the date of this Bill of Sale to exercise its rights to take title hereunder, and after such period, any items not removed from the Retained Property shall remain the property of Seller and Purchaser shall have no further rights with respect to same.

See Exhibit B, Attachment 5—Inventory to Schedule One to Trustee's Bill of Sale.

8.      As the language of the above bid indicates, GIP specifically purchased the option to take possession of Kish and other materials from the Retained Property rather than the option to purchase those materials from the GSS' estate at a later time.

9.      The Bankruptcy Court approved the sale of the Steel Mill Assets to GIP, over the objections of unsuccessful bidders and other interested parties, including that the GIP bid was not a qualifying bid because GIP had elected to "'pick and choose' which property they wanted to keep and which property they wanted to leave to the trustee to be abandoned." See Exhibit A at p. 28.

10.      In approving the sale of the Steel Mill Assets to GIP, the Bankruptcy Court found that notice of the auction of the property, including the Kish, was provided to, among other entities, state and federal environmental authorities. See Exhibit A at ¶16.

11.     Accordingly, the EPA, through its participation in the Bankruptcy Action and failure to object to the sale to GIP, had notice that GIP was not the owner of the Retained Property but had purchased the option to take the Kish and other materials from the Retained Property.

12.     Following GIP's purchase of the Steel Mill Assets, including, but not limited to, the option to take the Kish and other materials from the Retained Property, GIP entered into an oral contract with a party ("GIP's Contractor") to remove the marketable Kish from the waste piles located on the Retained Property and sell it, leaving the unmarketable Kish behind.

13.     The EPA, which had been conducting remediation efforts on the Retained Property, objected to GIP's activities, refused GIP's Contractor access to the Retained Property, prevented GIP from exercising its option to take, and, upon information and belief, began removing the Kish and selling it to offset the expenses of the remediation.

14.     The United States, acting through the EPA, knew that GIP was exercising its option to take the Kish lawfully purchased through the Bankruptcy Action.

15.     The United States, acting through the EPA, knew that the Kish belonged to GIP.

16.     In response to the EPA's actions, GIP notified the EPA of its ownership interest in the Kish and the damages caused to GIP's interests as a result of EPA's activities.

17.     The United States knew that the EPA had no authority, right or consent of any nature to lawfully sell GIP's Kish.

18.     Despite numerous requests, the EPA has prevented GIP from accessing the Retained Property in order to remove its Kish.

19.     Despite numerous requests, the EPA has failed and refused to compensate GIP for the fair market value of its Kish that the EPA has taken.

## CLAIM FOR RELIEF
### Taking of Private Property Without Just Compensation

20.     Paragraphs 1 through 15 are incorporated by reference.

21.     The Fifth Amendment to the United States Constitution provides that "[n]o person shall be...deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use without just compensation."

22.     Defendant's actions as described above constitute a taking of GIP's private property, for which just compensation is due under the Fifth Amendment to the Constitution of the United States.

23.     In violation of the Constitution of the United States, Defendant has not paid to GIP just compensation for GIP's property so taken.

24.     Accordingly, GIP is entitled to a declaration of this Court that its private property has been taken for public use, and an order compelling Defendant to pay to GIP the fair market value for this property in an amount to be determined at trial.

**WHEREFORE**, GIP respectfully requests that this Court enter judgment in its favor and against the United States as follows:

1.  A declaration of this Court that GIP's private property has been taken for public use, and an order compelling Defendant to pay GIP just compensation for this property, in an amount to be determined at trial;

2.  Pre-judgment and post-judgment interest;

3.  Attorneys' fees and costs of prosecuting this matter; and

4.  Such other relief in the interests of justice as the Court may deem just and proper.

Dated:  November 1, 2010

Respectfully submitted,

BABST, CALLAND, CLEMENTS & ZOMNIR, P.C.

By:

D. Matthew Jameson III, Esquire
PA ID No. 67764
Babst, Calland, Clements & Zomnir, P.C.
Two Gateway Center, 8th Floor
Pittsburgh, PA 15222
Phone:  412-394-5400
Facsimile:  412-586-1078
mjameson@bccz.com

# EXHIBIT A

# United States Bankruptcy Court

### Northern District of Alabama, Eastern Division

In re:
**GULF STATES STEEL, INC.**
of **ALABAMA,**
                              Debtor

Address:
174 South 26th Street
Gadsden, Alabama

Employer Id. No.:    63-1141013

}
}
}
}
}
}
}
}
}

**CASE NO.   99-41958-JSS-7**
**CHAPTER   7**

SEP 2 7 2002

FILED.....................
UNITED STATES
BANKRUPTCY COURT
ANNISTON, ALA.

DEPUTY CLERK

1434

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER GRANTING TRUSTEE'S MOTION FOR AN ORDER AUTHORIZING SALE OF PROPERTY OF THE ESTATE FREE AND CLEAR OF LIENS AND OTHER INTERESTS

The Motion of James Henderson as the Chapter 7 Trustee of the bankruptcy estate of Gulf

States Steel, Inc. of Alabama (the "Trustee") For An Order Establishing Bidding And Other

Procedures In Connection With Sale Of Property Of The Estate Free And Clear Of Liens And Other

Interests And Motion For Authority For Such Sale (the "Sale Motion") came on regularly for hearing

on August 21, 2002, with respect to bidding procedures and related matters, and again on September

16, 2002, in order to confirm the results of the auction conducted by the Trustee and to consider

whether the Trustee should be authorized to complete the sale of the subject Steel Mill Assets (as

defined below). Both hearings were conducted before the Honorable James S. Sledge in the above-

entitled court. After having considered the Sale Motion and the accompanying Memorandum of

Points and Authorities, the various other pleadings filed in support of, and in opposition to, the Sale

Motion, and reflected on the docket of this case, the testimony presented at such hearings, and the

arguments of counsel appearing at such hearings, as reflected in the record of this matter, the Court

makes the following findings of fact, conclusions of law, and orders:

**EXHIBIT**

A

### Findings of Fact

1.  The debtor, Gulf States Steel Inc., of Alabama ("debtor" or "Gulf States Steel") commenced this case as a chapter 11 case on July 1, 1999. Shortly thereafter, Gulf States Steel obtained interim and final orders (the "DIP Financing Orders") from this Court granting the motion of Gulf States Steel to obtain postpetition secured financing from Ableco Finance LLC, as agent for certain other lenders ("Ableco"), in the approximate amount of $17 million (the "Ableco Loans"). The DIP Financing Orders, among other things, provided Ableco with a superpriority administrative claim and a lien and security interest upon all assets of the debtor's estate of first priority (with certain minor exceptions noted in the Ableco loan documentation). In order to accommodate the Ableco financing, representatives of the holders of the 13½% Series B First Mortgage Notes (the "Secured Mortgage Notes") in the amount of $190 million (with collateral having an assessed value in excess of $180 million) agreed to subordinate the lien of State Street Bank and Trust Company, as successor in interest to Shawmut Bank Connecticut, N.A., as the indenture trustee ("Indenture Trustee") with respect to such Secured Mortgage Notes, against the property, plant and equipment, and the real property comprising the Gulf States Steel steel mill located in Gadsden, Alabama. In addition to the mortgage liens, the property was encumbered by tax claims and environmental claims.

2.  By order entered on July 20, 1999 (the "Preferred Trade Vendor Order"), at the request of Gulf States Steel, this Court authorized Gulf States Steel to enter into arrangements with trade vendors willing to provide Gulf States Steel with certain levels of postpetition unsecured credit ("Preferred Trade Vendors") that provided Preferred Trade Vendors with, among other

things, a superpriority claim (junior in priority to that of Ableco) and a lien on the collateral of the Indenture Trustee senior in priority to the lien of the Indenture Trustee (the Indenture Trustee and representatives of the holders of the Secured Mortgage Notes also consented to the subordination of the Indenture Trustee's lien to that of the Preferred Trade Vendors). The parties estimate that the current amount of the Preferred Trade Vendor liens is approximately $7.5 million. The liens in favor of the Preferred Trade Vendors were "collection liens" in that substantial restrictions were placed the ability of the Preferred Trade Vendors to collect upon those liens.

3.  Gulf States Steel continued to operate its steel making facilities as a debtor in possession until approximately August of 2000.  Prior to that time Gulf States Steel proposed a plan of reorganization that was dependant upon Gulf States Steel obtaining new financial facilities partially guarantied by the U.S. Government pursuant to the Emergency Steel Loan Guarantee Act of 1999.  Gulf States Steel and its proposed lender applied for such a government guaranty.  The Emergency Steel Guarantee Loan Board declined to approve a government guarantee.

4.  On August 2, 2000, Gulf States Steel filed with this Court its notice of intent to discontinue further operations and commenced limited wind-down operations to complete work in process to finish product.

5.  In November of 2000, debtor's chapter 11 case was converted to a chapter 7 case and James Henderson was appointed the chapter 7 trustee.

6.  On May 31, 2001, Ableco, acting as the senior secured lender to Gulf States Steel and pursuant to a power of attorney contained in the loan documents approved by this Court,

3

submitted to the Etowah County Board of Equalization (the "Board of Equalization") its objection to the valuation of all the Debtor's real and personal property for the purposes of assessing property taxes (the "May 2001 Objection"). Pursuant to the May 2001 Objection, Ableco objected to the valuation of the real and personal property for tax years 1999, 2000 and 2001.

7.    By letter dated September 7, 2001, the Board of Equalization sent to counsel for Ableco their records on values for the Debtor's property for tax years 1999, 2000 and 2001. Based on the records transmitted with such letter, the Board of Equalization maintained the following values for the Debtor's property: 1999 Real Property - $104,497,212, 1999 Personal Property - $187,234,658, 2000 Real Property - $41,617,183, 2000 Personal Property - $177,446,229, 2001 Real Property - $41,095,747, and 2001 Personal Property - $165,568,098.

8.    On May 31, 2002, Ableco submitted to the Board of Equalization its objection to the valuation of all the Debtor's real and personal property for the purposes of assessing property taxes. Pursuant thereto, Ableco objected to the valuation of the real and personal property for tax year 2002, restated the status of the May 2001 Objection and requested that the Board of Equalization notify Ableco of an appropriate time to meet or discuss the objections. The Board of Equalization has postponed all proceedings in connection with such objections and the same have not been resolved.

9.    In May of 2001, this Court approved the sale by public auction of numerous items of equipment and the sale by private sale of certain real property and equipment used primarily in the manufacture of steel beams for the mobile home industry (the "Beam Mill") pursuant to Section 363 of the Bankruptcy Code.

4

10.   On July 3, 2002, the Trustee filed the Sale Motion seeking authorization to consummate a sale of approximately 600 acres of real property on which the debtor's former steel operations were located (carving out from the real property to be purchased, among other real property, the real property underlying the coke ovens and melt shop) and substantially all of the debtor's remaining fixtures, plant and equipment (including the plate mill, the hot roll mill, and the cold roll mill). These assets are further described in the Sale Motion and are referred to herein as the "Steel Mill Assets". This proposed sale was to Gulf States Reorganization Group ("GSRG") for a purchase price of $5 million pursuant to an Asset Purchase Agreement or, alternatively, to the highest bidder pursuant to bidding procedures to be prescribed by the Court. The terms of the Asset Purchase Agreement and the specific bidding procedures were drafted by representatives of the Ableco and GSRG.

11.   The Court set an initial hearing on the Sale Motion for August 21, 2002, to consider bidding procedures and other matters.  The Court also requested the Trustee and any other parties supporting the Sale Motion to provide further briefing on the issue of the Trustee's ability to sell the Steel Mill Assets free and clear of liens and other interests under § 363 given that the Steel Mill Assets are fully encumbered by the liens asserted against the Steel Mill Assets.

12.   On August 19, 2002, Gadsden Industrial Park, LLC (hereinafter "Park") filed its Objection of Gadsden Industrial Park, LLC, a Potential Bidder, to Trustee's Motion for an Order Establishing Bidding Procedures (the "Park Objection") in which Park asserted that competing bids should not be required to be identical in form and as to the assets being purchased in order to be considered by the Trustee.

13.   At the August 21, 2002, hearing, the Trustee presented documentary exhibits and testimony

on the liens appearing of record against the Steel Mill Assets, the negotiations between Ableco and GSRG for the purchase and sale of the Steel Mill Assets, and the factors considered by the Trustee in agreeing to certain of the bidding procedures to which objection was made by parties in interest. The proposed bidding procedures provided that competing bidders could only modify the GSRG/Trustee purchase and sale agreement by replacing the name of the purchaser with that of the competing bidder and by increasing the sales price. Ableco and two competing bidders, Gadsden Industrial Park LLC (a newly formed Delaware limited liability company) and Palini e Bertoli (an Italian firm in the steelmaking business) objected to such restrictions being placed upon competing bidders. The Trustee defended this provision on the grounds that requiring identical competing bids would assist the Trustee in determining the highest and best bid.

14.     On August 26, 2002, Court entered its Order granting Trustee's Motion For An Order Establishing Bidding And Other Procedures In Connection With Sale Of The Estate Free And Clear Of Liens And Other Interests (the "Bidding Procedure Order"). In the Bidding Procedures Order, the Court concluded that the Trustee failed to present sound business reasons why the Court should not allow bids as proposed by Park and that identical bids were not required for the Trustee to make a determination as to which bid is the highest and best bid to recommend to the Court for approval. The Bidding Procedures Order approved other bidding procedures as presented.

15.     In addition to other procedures, the Bidding Procedures Order established a bid submission deadline of September 12, 2002 and in the event of at least one qualified bid, the Trustee would conduct an auction at 10:00 a.m. on September 16, 2002. The Bidding Procedure Order

6

further approved the proposed procedure that "[a]t the Auction, all qualified bidders shall be given the opportunity to revise and submit increased Bids so long as the increased Bid or Bids is at least $50,000 higher than the then existing highest or better Bid. Such bidding shall continue until the Trustee concludes the Auction, which the Trustee may elect to do at anytime if no increased Bid has been submitted to the Trustee or his designee within thirty (30) minutes from the submission of the last increased Bid." Finally, the Bidding Procedure Order provided for the final hearing on the Sale Motion.

16.  Pursuant to the terms of the Bidding Procedure Order, the Trustee provided notice of the auction and the final hearing on the Sale Motion to all creditors of the Gulf States Steel estate, as well as known competing bidders for the Steel Mill Assets, all entities claiming a lien or other interest in the Steel Mill Assets, state and federal environmental authorities, and all parties requesting special notice and published such notice in the national edition of the Wall Street Journal once a week for two weeks prior to the auction.

17.  On September 12, 2002, Park timely submitted its bid in the amount of $5,250,000 (the "Park Bid") in conformance with the procedures set forth in the Bidding Procedures Order. No competing bid was submitted by Palini e Bertoli.

18.  The Park Bid is substantially similar to the GSRG bid except for the proposed increased sale price as required pursuant to the Bidding Procedures Order and provisions which permit Park to purchase less property of the estate than GSRG proposed to purchase as expressly permitted by the Bidding Procedures Order.

19.  As there was at least one qualified Overbid for the property (Park), pursuant to the Bidding Procedures Order, an auction was held at the debtor's plant site on September 16, 2002.

7

20.    The Trustee received twenty-two cash bids with the last all-cash bid being that of Park in the amount of $6.3 million.

21.    GSRG then tendered a bid purporting to be in the amount of $7 million dollars. The bid went on state the "amounts required by Ableco in order to pay Ableco in full and to comply with the terms of the Court's order on the Motion to Amend Compensation Agreement between the Trustee and Ableco will be paid in cash at closing, and the balance of the Purchase Price shall be offset (credited) from the allowed secured claim held by GSRG, to the extent allowed by Title 11 U.S.C. § 363(k)." The bid did not specify a monetary figure to pay Ableco in full and meet the requirements of the Order on the amended compensation agreement between the Trustee and Ableco. The bid did not include any authorization of a credit bid by the Indenture Trustee, the holder of the mortgage which benefits bondholders, of whom GSRG represents approximately 15% ($30 million of the total $190 million).

22.    Park objected to this bid as being too indefinite for Park to respond, as not being an all-cash bid as contemplated by the Bidding Procedures Order, and as proposing an off-set or credit in violation and in contravention of the priority provisions of the Bankruptcy Code. Due to several claims with higher priority than the bondholders, Park objected stating § 363(k) does not authorize an offset as proposed in the GSRG bid.

23.    The Trustee rejected the GSRG Credit Bid on the grounds that it was not an all-cash offer, the dollar amount of the cash component of the bid was unclear, and the Trustee did not feel that he had the authority to determine whether GSRG had the right to credit bid or the value of that credit bid. The Trustee extended the time within which GSRG could submit an unqualified cash bid in excess of that of Park.

8

24.   After being given several opportunities to tender an unqualified cash bid in excess of the last bid received from Park in the amount of $6.3 million, GSRG declined to submit any further unqualified cash bid.

25.   Park asserted on the record that had GSRG submitted a further unqualified cash bid, it was ready, willing, and able to continue with the bidding process on a cash bid basis.

26.   At the final hearing on the Sale Motion the Trustee reported that he proposed to accept the unqualified cash bid of Park in the amount of $6,300,000 as the highest bid received at the auction which conformed with the Bidding Procedures Order, and the best bid using his best business judgment.

27.   On September 11, 2002, the City of Gadsden delivered to the Trustee a letter dated September 9, 2002 (the "City Letter"), objecting to the alterations made to the bidding procedures by the Court as a result of the August 21, 2002, hearing and reflected in the Bidding Procedure Order. Trustee's Exhibit A. The City Letter was delivered to each of the potential competing bidders on September 11, 2002. The City Letter was never filed with the Court. The Trustee presented the City Letter at the final hearing on the Sale Motion as an additional, unfiled objection to the Sale Motion.

28.   On September 12, 2002, certain bondholders some of whom established GSRG (the "Objecting Bondholders") filed an objection and brief in opposition to a sale to any bidder other than GSRG. The Objecting Bondholders assert that the limitations of § 365(f), the Dewsnup decision, and the takings clause of the Fifth Amendment compel the conclusion that the Objecting Bondholders (and presumably all other bondholders receiving benefits from the Secured Mortgage Notes, along with all lienholders) must affirmatively consent to any sale

9

of the Steel Mill Assets that does not pay their claims in full.

29. The Bondholders hold only a portion of the bonds secured by the Steel Mill Assets and the Indenture Trustee of the bond issue has not objected to the Sale Motion or the Sale Order. The Objecting Bondholders have no authority to speak for all the bondholders. The secured mortgage notes which benefit the bondholders are controlled by State Street Bank and Trust Company, as the Indenture Trustee.

30. On September 13, 2002, the United Steel Workers of America filed a pleading urging the Court to consider factors other than the sales price in determining the highest and best bid. Such factors would include impact upon the community, the creation of jobs and environmental concerns.

31. At the final hearing on the Sale Motion, GSRG filed a "Motion For Order Compelling Trustee To Accept Bid of Gulf States Reorganization Group, Inc." (the "GSRG Motion to Compel") and an "Objection of Gulf States Reorganization Group, Inc. To Consideration of Bid by Gadsden Industrial Park, LLC And Motion to Disallow the Same" (the "GSRG Disallowance Motion").

32. In the GSRG Disallowance Motion, GSRG asserts that Gadsden Industrial Park, LLC failed to comply in numerous ways with the Bidding Procedures Order. Among other things, GSRG alleges that the modified purchase and sale agreement tendered by Gadsden Industrial Park, LLC (the "Modified Contract"):

    A. Added a paragraph allowing Gadsden Industrial Park, LLC to take title to less than all of the Steel Mill Assets (the Court notes that this paragraph is entirely consistent with the changes made to the bidding procedures as a result of the August 21, 2002,

hearing and reflected in the Bidding Procedures Order);

B.   In its letter to the Trustee accompanying the Modified Contract, Gadsden Industrial
Park, LLC states that the language in the Modified Contract that the sale be "free and
clear of all liens, claims, encumbrances and other interests" includes any claim of any
governmental agency even though no language to this effect is included in the
Modified Contract;

C.   In its letter to the Trustee, Gadsden Industrial Park, LLC states that its bid is
conditioned upon "such other conditions as Gadsden or the Bankruptcy Court may
determine are necessary to close the Transaction" including specific conditions
precedent such as obtaining all necessary governmental and third party consents and
approvals; and

D.   Increased the time for the purchaser to close the transaction from 60 days after entry
of an order approving the sale to at least 70 days thereafter.

33.   GSRG argued that the Park bid must be rejected outright because of these and other reasons,
or approval of the bid must be deferred pending further proceedings of the Court.

34.   At the final hearing on the Sale Motion, ICON Receivables 1988-A, Inc. (ICON) restated its
limited objection with respect to the sale of a Mesta Roll Grinder ("Mesta Grinder") in which

---

¹ GSRG also speculated, with the benefit of no admissible evidence, that the Gadsden
Industrial Park, LLC bid is financially backed by Nucor Corporation in an attempt to preempt
any additional competition in the hot rolled steel market dominated by Nucor. GSRG further
asserts that Nucor has a clear monopoly position on hot rolled sheet steel in the Southeastern
United States. In the absence of any evidence to support GSRG's assertion, and with no
opportunity or forum for Nucor to defend against these antitrust allegations, the Court sees
no basis to entertain GSRG's assertions that any sale to Gadsden Industrial Park, LLC would
violate applicable antitrust laws.

ICON asserts an uncontested purchase-money security interest.  Ableco acknowledged ICON's first priority position with respect to that equipment, and Park acknowledged that equipment does not constitute any part of the Steel Mill Assets it proposes to purchase.

35.    Park is a good faith purchaser pursuant to 11 U.S.C. §363(m); and Park is not a successor in interest to the debtor or the Trustee.

36.    Notice of the Sale Motion and the final hearing thereon was appropriate under the circumstances.

37.    The sale of the Steel Mill Assets in the manner set forth herein will maximize the sale proceeds to be received by the debtor's estate in connection with the sale of the Steel Mill Assets and is in the best interests of the debtor's estate and creditors of the estate.

### Conclusions of Law

Pursuant to 11 U.S.C. §363(f) the trustee may sell property of the estate "free and clear of any interest in such property of an entity other than the estate, only if—(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; . . . (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. §363(b), (f). Since the five conditions listed in 11 U.S.C. §363(f) are phrased in the disjunctive, property may be sold free and clear of interests if any one of the five conditions is satisfied. In re WBQ Partnership, 189 B.R. 97 (Bankr. E.D. Va. 1995).

The Trustee seeks permission to sell the property free and clear pursuant to § 363(f)(2), (4) and (f)(5). As stated above, (f)(2) allows a sale free and clear if the lienholder or interest holder consents to the sale. Ableco, the first priority lienholder has consented to the Sale Motion. The

12

Trustee may therefore sell the Steel Mill Assets free and clear of this lien under § 363(f)(2).

Likewise, the Revenue Commissioner, as agent for the State of Alabama and Etowah County submitted a pleading consenting to the Sale Motion on the condition that the liens of such taxing authority attach to the proceeds of sale. (Doc. No. 1413).

The Preferred Trade Vendors are deemed to have consented to the Sale Motion (actively supported by Ableco) by virtue of the provisions of the Preferred Trade Vendor Order (the Preferred Trade Vendors may not "contest, object to or otherwise dispute the valuation of collateral subject to the Trade Collection Lien, or any other action that holders of senior liens may take with respect to such collateral . . ."). The Trustee may therefore sell the Steel Mill Assets free and clear of this lien under § 363(f)(2).

Bankruptcy Code Section 363(f)(4) allows a sale to proceed free and clear of any interest if the interest is in bona fide dispute. The purpose of § 363(f)(4) is to permit property of the estate to be sold free and clear of interests that are disputed by the estate "so that liquidation of the estate's assets need not be delayed while such disputes are being litigated." In re Clark, 266 B.R. 163, 171 (9th Cir. BAP 2001)(citing 3 Lawrence P. King, *Collier on Bankruptcy* ¶ 363.06 (15th ed. rev. 1998)).

The trustee bears the burden of showing that a bona fide dispute exists. See In re Terrace Chalet Apartments, Ltd., 159 B.R. 821, 828 (N.D. Ill. 1993) (citing In re Octagon Roofing, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991). Property may be sold free and clear of a lien when the dispute involves third parties. In re Gerwer, 898 F.2d 730, 733 (9th Cir. 1990) (bona fide dispute need not be between the debtor or trustee and lienholder, but rather, if the outcome of dispute over interest will affect value of estate, statutory language is sufficient to embrace interest).

The term "bona fide dispute" is not defined in the Bankruptcy Code. See In re Octagon

13

Roofing, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991); In re Taylor, 198 B.R. 142, 162 (Bankr. D.S.C.

1996); In re Collins, 180 B.R. 447, 452 (Bankr. E.D. Va. 1995). However, this term is used both is

§ 363(f)(4) and § 303(b). 11 U.S.C. §§ 303 and 363. Courts interpreting § 363(f)(4) have

consistently held that for a bona fide dispute to exist the court must determine "whether there is an

objective basis for either a factual or legal dispute as to the validity of the debt." In re Octagon

Roofing, 123 B.R at 590; In re Bedford Square Associates, 247 B.R. 140, 145 (Bankr. E.D. Penn.

2000) (although the debtor had not commenced a strong-arm proceeding to avoid a provision from

a shopping mall lease, the fact that it could was sufficient to establish a "bona fide dispute"); In re

Olympia Holding Corp., 129 B.R. 679, 681 (Bankr. M.D. Fla. 1991); Collins, 180 B.R. at 452 (there

must be "an objective basis for either a factual or legal dispute as to the validity of the debt"); Taylor,

198 B.R. at 162.

Additionally, courts interpreting the term "bona fide dispute" as it applies to §303(b) have

consistently held that a "bona fide dispute" exists when "there is an objective basis for either a factual

or a legal dispute as to the validity of debt." In re Brusick, 831 F.2d 745, 750 (8th Cir. 1987). See

also In re Atlas Machine & Iron Works v. Bethlehem Steel, 986 F.2d 709 (4th Cir. 1993) (bona fide

dispute exists where there is a meritorious existing conflict as to creditor's right to payment); Atwood,

124 B.R. at 407 (bona fide dispute exists if "there is either a genuine issue of material fact that bears

upon the debtor's liability, or a meritorious contention as to the application of law to undisputed

facts."); In re Leach, 92 B.R. 483, 487 (Bankr. D. Kan. 1988) (same); In re Ramm Industries, Inc.,

83 B.R. 815, 823 (Bankr. M.D. Fla. 1988) (same).

While courts require evidence that shows that there is an "objective basis" for the dispute, the

court is not required to determine the underlying dispute or determine the probable outcome, rather

14

only that a dispute does in fact exist. See Octagon Roofing, 123 B.R. at 590; Taylor, 198 B.R. at 162; Collins, 180 B.R. at 452.

As stated in the Findings of Fact above, a valid legal and factual dispute exists as to any taxes owed based upon the filed objections to the assessed values of the Property. Accordingly, pursuant to 11 U.S.C. § 363(f)(4) this sale will be allowed to proceed pursuant to the Sale Motion over any objection by any Taxing Authority.

Section 365(f)(5) provides that the Trustee may sell the Property free and clear of any interest if the holder of that interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5); see, In re P.K.R. Convalescent Centers, Inc., 189 B.R. 90 (Bankr. E.D. Va. 1995) (allowing the sale of nursing home assets under §363(f)(5) over objection where interest was reducible to a claim and subject to a hypothetical money satisfaction). By its express terms, Section 363(f)(5) permits a sale free and clear "if the trustee can demonstrate the existence of another legal mechanism by which a lien could be extinguished without full satisfaction of the secured debt." In re Terrace Chalet Apartments, Ltd., 159 B.R. 821, 829 (Bankr. N.D. Ill. 1993) (finding that Section 1129(b)(2) cram down is such a provision in Chapter 11).

Some courts that have addressed Section 363(f)(5) overlap their discussions with the provisions of Section 363(f)(3). See AG Van Metre, supra; In re Canonigo, 276 B.R. 257 (Bankr. N.D.Cal. 2002); In re Beker Industries Corp., 63 B.R. 474 (Bankr. S.D.N.Y. 1986). However, "Section 363(f)(5) would repeat Section 363(f)(3) if it were interpreted merely to require a specific amount of money that the trustee could pay in order to sell the property free and clear of a lien." Terrace Chalet, 159 B.R. at 829. Cases requiring full payment under Section 363(f)(5) are "obsolete,

15

inasmuch as [they are] inconsistent with the bankruptcy code." In re Grand Slam, U.S.A., Inc., 178

B.R. 460, 462 (E.D. Mich. 1995); Healthco Int'l, 174 B.R. at 176 (since any lien can be discharged

by full payment of the underlying debt pursuant to § 363(f)(3), it makes no sense that § 363(f)(5)

requires full payment); Terrace Chalet, 159 B.R. at 829 (decisions which require full payment of liens

absent a showing of equitable consideration renders § 363(f)(3) superfluous).

Section 363(f)(5) does not require that the sale price for the Property must exceed the value

of the interests, but rather, only that the mechanism exists to address extinguishing the lien or interest

without paying such interest in full. Grand Slam, 178 B.R. at 463. The phrase "could be compelled"

only requires "that the interest in question be subject to final satisfaction on a hypothetical basis, not

that there be an actual payment in satisfaction of the interest from the proceeds of the sale in

question." Healthco Int'l, 174 B.R. at 176. Even if an actual payment were required, the lienholder

would only be entitled to receive what it would receive in the event of a cram-down. Here, due to the

size and nature of the Ableco lien, the indubitable equivalent as required in 11 U.S.C. §

1129(b)(2)(A)(iii) would be nothing. Like "cram downs" in Chapter 11 cases, "Section 724(b)

compels lien creditors in appropriate cases to accept a money satisfaction of their interests by the

payment of less than the full amount of the debt." Grand Slam, 178 B.R. at 463.

In this case, the fact that each of the claims, liens or interests identified in the Sale Motion

could be compelled to accept a money satisfaction in a cram down plan of reorganization in a Chapter

11 case, the DIP Financing Orders provide that Ableco has a lien on the Property that is senior in

priority to such claims, liens or interests, and the holders thereof would be compelled as a matter of

law to release the same in a judicial or non-judicial foreclosure of the senior liens held by Ableco.

See Ala. Code §35-10-5.

In addition, with respect to the claims of the Taxing Authorities, Bankruptcy Code Section 724 dictates that the Taxing Authorities can be compelled to accept a money satisfaction of their interest. Like the cram down provision in § 1129(b)(2), "[s]ection 724(b) compels lien creditors in appropriate cases to accept a money satisfaction of their interests by the payment of less than the full amount of the debt." Grand Slam, 178 B.R. at 463-4. See also Healthco Int'l, 174 B.R. at 177 (Section 724(b) allows the court to compel a taxing authority to accept "money satisfaction" of its tax lien by payment of less than the full amount of tax debt, such that property could be sold free and clear of the taxing authority's tax lien); In re A.G. Van Metre, Jr., Inc., 155 B.R. 118 (Bankr. E.D. Va. 1993), aff'd without opinion, 16 F.3d 414 (4th Cir. 1994) (full satisfaction of a statutory tax lien against property was not required as a condition to the approval of a Chapter 7 trustee's sale of the property free and clear of all liens).

Section 363(f)(5) does not require that the sale price for the Property must exceed the value of the interests, but rather, only that the mechanism exists to address extinguishing the lien or interest without paying such interest in full. Grand Slam, 178 B.R. at 463. The phrase "could be compelled" only requires "that the interest in question be subject to final satisfaction on a hypothetical basis, not that there be an actual payment in satisfaction of the interest from the proceeds of the sale in question." Healthco Int'l, 174 B.R. at 176. Like "cram downs" in Chapter 11 cases, "Section 724(b) compels lien creditors in appropriate cases to accept a money satisfaction of their interests by the payment of less than the full amount of the debt." Grand Slam, 178 B.R. at 463.

The foregoing is consistent with the sale free and clear ordered by this Court in connection with the prior Section 363 sales of the beam mill and the many assets offered at public auction in May, 2001.

17

The Bondholders objections on Fifth Amendment and <u>Dewsnup</u> grounds are due to be overruled.[2] In <u>Dewsnup v. Timm</u>, 502 U.S. 410 (1992), the debtors were the owners of farmland encumbered by a deed of trust securing a debt that was far in excess of the value of the property. The debtors defaulted and, before the holder of the deed of trust could foreclose, filed for bankruptcy relief under Chapter 11 of the Bankruptcy Code. This initial petition was dismissed and the debtors later filed for relief under Chapter 7 of the Bankruptcy Code. The debtors sought to have the bankruptcy court, pursuant to § 506(a), value the property at its fair market value which was substantially less than the amount owed to the secured creditor. This amount reflected a steep decline in the general market value of farmland in that area. In conjunction with § 506(a), the debtors also sought to use § 506(d) to "strip down" the secured creditor's lien by reducing the amount of the debt secured by the lien to the judicially determined value of the property. The intended effect to the lien holder was that, if the lien could be "stripped down" to the judicially determined value, the secured creditor would lose the benefit of any "appraisal error" in the judicially determined value as well as any subsequent market increase in the value of the property in any subsequent foreclosure action. Thus, if the lien were effectively "stripped down" to the judicially determined value, then any amount of the subsequent sales price that exceeded the judicially determined value would be distributed to the

---

[2] There is some question as to whether the Court should even consider the objections of the bondholders. These are not objections by secured creditors concerning sale of their collateral. Considering the nature of their claims, these objections may not even be objections of creditors, much less secured creditors. The objecting bondholders acknowledge in their Motion that the Indenture Trustee is the holder of the mortgage, and that they are mere holders of beneficial interests arising out of the rights of the Indenture Trustee. These bondholders have no direct claim or enforceable interest in this case. Only the Indenture Trustee has standing to assert these objections on behalf of the bondholders and the Indenture Trustee has made no appearance in opposition to the sale. As such, the objection by the bondholders could be deemed as merely a statement as to their recommendation to whom the Trustee should approve. Nevertheless, the Court addresses the objections in order to fully consider all perspectives.

debtor or the other unsecured creditors instead of the secured creditor

The Court in <u>Dewsnup</u> hinted that a possible Fifth Amendment violation may exist if it allowed the lien stripping due to the "post-stripping" appreciation of collateral. It stated that:

> [t]he practical effect of petitioner's argument is to freeze the creditor's secured interest at the judicially determined valuation. By this approach, the creditor would lose the benefit of any increase in the value of the property by the time of the foreclosure sale. The increase would accrue to the benefit of the debtor, a result some of the parties would describe as a windfall.

> We think, however, that the creditor's lien stays with the real property until the foreclosure. That is what was bargained for by the mortgagor and the mortgagee. . . . any increase over the judicially determined valuation during bankruptcy rightfully accrues to the benefit of the creditor and not to the benefit of other unsecured creditors whose claims have been allowed and who had nothing to do with the mortgagor-mortgagee bargain.

<u>Dewsnup v. Timm</u>, 502 U.S. 410, 417 (1992). Thus, the <u>Dewsnup</u> court avoided a potential Fifth Amendment problem by interpreting § 506(d) as not authorizing "lien stripping." While expressly limiting its opinion to the facts before it[3], the Supreme Court in <u>Dewsnup</u> held that § 506(d) voids liens on the basis of whether the underlying claim is allowed or disallowed under § 502. <u>Dewsnup v. Timm</u>, 502 U.S. 410, 415-7 (1002); see also 4 COLLIER ON BANKRUPTCY ¶ 506.06[1][a] (Lawrence P. King ed., 15th ed. rev. 1998) (this interpretation makes a great deal of sense because it is consistent with the legislative history, it is consistent with the exceptions set forth in § 506(d)(1) and (2), and it allowed the Court to avoid a potential Fifth Amendment problem).

As Justice Scalia indicates in his dissent, the <u>Dewsnup</u> court reached its conclusion by a questionable construction of § 506(d). The Court determined that § 506(d) does not void liens on the

---

[3] "Hypothetical applications that come to mind and those advanced at oral argument illustrate the difficulty of interpreting the statute in a single opinion that would apply to all possible fact situations. We therefore focus upon the case before us and allow other facts to await their legal resolution on another day." 502 U.S. at 416-417.

basis of whether they are secured under § 506(a), but rather on the basis of whether the underlying claim is allowed or disallowed under § 502.

The <u>Dewsnup</u> majority based its textual analysis on two premises. First, it explained that § 506(a) is not a definitional section and therefore, the words "allowed secured claim" do not have to mean the same thing in § 506(d) as they do in § 506(a). 502 U.S. at 417. Second, the court explains that the legislative history of § 506(d) indicates that its purpose was to permit liens to pass through bankruptcy unaffected. 502 U.S. at 418.

Section 506(a) is based upon a "priority" concept of security. Under the "priority" concept of security, "security" means a right not to a specific piece of collateral, but simply a right to be paid first to the extent of the value of the collateral. <u>See</u> Douglas G. Baird & Thomas H. Jackson, <u>Corporate Reorganizations and the Treatment of Diverse Ownership Interests: A Comment on Adequate Protection of Secured Creditors in Bankruptcy</u>, 51 U. Chi. L. Rev. 97, 113-4 (1984) ("The secured creditor's ultimate remedy is to sell the asset and thereby realize the asset's value in the marketplace . . . This definition of the secured creditor's remedy suggest that the probability of repayment and not any intrinsic interest in the collateral itself is the principal element of the value of his bargain with the debtor."); Charles A. Shanor, <u>A New Deal For Secured Creditors In Bankruptcy</u>, 28 EMORY L.J. 587, 595 n. 39 (1979) ("The Code's focus on the value of the secured party's claim rather than on the security itself is a substantial change from both the Act and the U.C.C.").

The Bondholders support their argument that the Steel Mill Assets may not be sold without their express consent by citing the opinion of Justice Brandeis in <u>Louisville Joint Stock Land Bank v. Radford</u>, 295 U.S. 555 (1935). The Frazier-Lemke statute which <u>Radford</u> held unconstitutional contained a peculiarity. The statute created a uniform five year plan of

20

reorganization for farm loans in default, reducing the lien and payment on that lien to the appraised fair market value of the farm. By its terms the statute and its standard plan were strictly limited to liens in existence as of the effective date of the statute. Justice Brandeis had no problem holding that Congress could *not* impair liens in existence as of the effective date of the passage of lien modification legislation without violating the Fifth Amendment. Justice Brandeis held that "[b]ecause the act is retroactive, in terms, and, as here applied, purports to take away rights of the mortgagee in specific property, [the Fifth Amendment] is controlling." Id. at 589. Since § 363(f) is not retroactive in its application, Radford is not applicable.

Furthermore, Radford has been seriously eroded if not overruled by Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440 1937) (holding that the second Frazer-Lemke Act, which was almost identical to the Act invalidated in Radford, was constitutional); see also Helvering v. Griffiths, 318 U.S. 371, 401 n. 52 (1943) (stating that the Supreme Court reexamined and corrected the "error" of Radford by its holding in Vinton Branch ); In re A.V.B.I., Inc., 143 B.R. 738, 746 (Bankr. C.D. Cal. 1992) (noting that Radford had fallen into disrepute and was of doubtful continued vitality). Cases discussing Radford correctly explain that lien avoidance under the federal bankruptcy power does not come within the traditional definitions of taking under the Fifth Amendment. In re Pillow, 8 B.R. 404, 411 (Bankr. D. Utah 1981) (holding that § 522(f), bankruptcy code section governing avoidance of liens on property, does not violate the takings clause of the Fifth Amendment). The Fifth Amendment protects a creditor's rights only to the extent of its interest in the collateral as that interest is defined by the bankruptcy laws. Travelers Ins. Co. v. Bullington, 878 F.2d 354, 359 (11th Cir. 1989) (holding that § 506 application to reduce under-secured creditor's allowed claim to value of collateral for purposes of § 1225(a)(5) withstands Fifth Amendment

21

challenge).

In applying § 363, the bankruptcy courts determine whether the property interests of third parties are adequately protected through consent or compensation. See Ultimate Sportsbar, Inc. v. United States, 48 Fed. Cl. 540 (January. 31, 2001); Bankruptcy Reform Act of 1978, S. Rep. 95-595, at 49-57 (1978), reprinted in 1978 U.S.C.A.A.N. 5787, 5835-43. The concept of adequate protection is derived from the fifth amendment protection of property interest as enunciated by the Supreme Court." See Wright v. Union Central Life Ins. Co., 311 U.S. 273 (1940); Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555 (1935).

Holding that the avoidance of a lien under § 506(d) would violate the Fifth amendment pursuant to due process or takings grounds would "call into question the entire history of lien avoidance in bankruptcy as well as the entire framework of the Code. The fact that due process and lien avoidance have coexisted since the Sixteenth Century, with the momentary aberration of Radford, requires the conclusion that [§ 506(d)] does not offend the [Fifth Amendment.]" In re Yi, 219 B.R. 394 (E.D. Va. 1998), citing In re Pillow, 8 B.R. 404, 424 (Bankr. D. Utah 1981).

As the Seventh Circuit has held, "not every prospective diminution in the rights of creditors can be an unconstitutional taking; for such a conclusion would come close to nullifying the Constitution's bankruptcy clause." In re Thompson, 867 F.2d 416, 422 (7th Cir. 1989). Clearly, in conducting any analysis of the Fifth Amendment takings clause as applied to the Bankruptcy Code, consideration must be given to the bankruptcy clause contained in Article I, section 8 of the Constitution.

Thus, a sale free and clear of interests under § 363(f)(5) can be reconciled with the Supreme Court's opinion in Dewsnup, especially under the facts in this case. First and foremost, the

Dewsnup majority went out of its way to make clear that the holding was limited to the facts before it. See Footnote 2 supra. Given that the Court was concerned that its holding not be applied even to other issues arising under § 506(a) or (d), it seems clear that the holding should not be exported to sales under § 363(f)(5).

Second, even though Dewsnup is still binding precedent, it has not received much acclaim. In fact, it has almost been universally criticized by the commentators. See A.W. Bailey III, Dewsnup v. Timm: Judicial Sleight of Hand in Statutory Construction of the Bankruptcy Code, 319 BYU Journal of Public Law (1993); Robert M. Lawless, Legisprudence Through a Bankruptcy Lens: a Study in the Supreme Court's Bankruptcy Cases, 47 Syracuse Law Review 1 (1996); and Walter A. Effross, Grammarians at the Gate: the Rehnquist Court's Evolving "Plain Meaning" Approach to Bankruptcy Jurisprudence, 23 Seton Hall Law Review 1636 (1993). Needless to say, with as much criticism as Dewsnup has garnered, this Court would be unwilling to expand it beyond its narrow scope.

Third, the gravest concern expressed by the Dewsnup Court was the fact that the interpretation of § 506(d) that would authorize lien stripping would lead to situations where the collateral of secured creditors would be taken away from the secured creditor and redistributed to the debtor or unsecured creditors. In a § 363 sale of collateral, however, that does not occur. There is no judicial determination of value, there is no judicial reduction in the value of the lien or the extent to which the lien attaches to the collateral. Instead, the value is determined by the marketplace, the collateral is reduced to cash proceeds (in most cases), and the lien attaches to the proceeds to the same extent and with the same priority that the lien attached to the collateral. There simply is no economic impairment to the holder of an undercollateralized lien as a result of a § 363 sale of the collateral and

23

there is no taking of any economic property from the secured creditor that could possibly support a constitutional taking claim.

Fourth, the lien stripping prohibited by <u>Dewsnup</u> has no corollary in bankruptcy or non-bankruptcy law. To the contrary, the minor alterations of the rights of secured creditors effected by § 363(f)(5) can only be accomplished if the same thing could happen to the secured creditor under established bankruptcy or non-bankruptcy law ("such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."). How could an undersecured creditor claim an unlawful taking if the creditor were paid the same thing in a foreclosure sale by a senior secured creditor or under a plan of reorganization? Clearly, this limitation and the other aspects of a § 363(f)(5) sale of collateral provide a secured creditor with adequate protection of its interests and substantive and procedural due process.

Fifth, even if a secured creditor were to assert that § 363 effects an unconstitutional taking of property without due process of law, such an assertion ignores the due process rights embodied in the Bankruptcy Code in general and in § 363 in particular. A secured creditor is accorded procedural due process by the notice and hearing provisions of the Bankruptcy Code applicable to § 363, as well as rights of appeal, etc. As discussed above, substantively, the secured creditor is entitled to a replacement lien upon the proceeds of the collateral. Any secured creditor asserting such a claim would have to explain why the battle-tested concepts of notice, opportunity for a hearing, and adequate protection in the form of replacement liens, does not provide ample due process for any such imagined taking.

. Lastly, the process embodied in § 363 of removing liens from one form of collateral and granting replacement liens in another form of economically equivalent collateral is much closer to

24

the universally accepted practice of providing secured creditors with adequate protection for the use, sale or lease of collateral by the trustee on the condition that the trustee provide the affected secured creditor with adequate protection of its interest in the collateral, than it is to the lien stripping prohibited in the Dewsnup case. If the Dewsnup prohibition on lien stripping were to be inappropriately expanded beyond the facts of the Dewsnup case and extended to § 363 sales on the theory that such a sale strips the undersecured creditor of its lien (of course, ignoring the replacement lien on the proceeds of the collateral), that same theory would dictate that authorizing the trustee to use cash collateral upon the condition that the secured creditor be provided with a replacement lien on economically equivalent collateral would also constitute lien stripping prohibited by Dewsnup. Such a theory and result is patently absurd[4].

The court's ruling is supported by the case of In re Tanner, 217 F.3d 1357 (11th Cir. 2000) in which the Eleventh Circuit Court of Appeals joined with a majority of circuits in holding that a wholly unsecured home mortgage could be "stripped off" pursuant to a Chapter 13. Likewise, in In re Paschen, 296 F.3d 1203 (11th Cir. 2002), the Eleventh Circuit Court of Appeals ruled that 11 U.S.C. §1322(c)(2) permits Chapter 13 debtors to bifurcate undersecured short-term mortgages into secured and unsecured claims and "cramdown" the unsecured portion of the claim under 11 U.S.C. §1325(a)(5).

The Court notes that the objection of the City of Gadsden goes to matters which were resolved pursuant to the Bidding Procedures Order. Because the City has not filed its objection or any other

---

[4] In his dissent, even Justice Scalia branded the notion of the Dewsnup holding adversely affecting the ability of the trustee to sell property under § 363 free and clear of liens as being absurd, both at the beginning of his paragraph addressing this issue as well as at the end of such paragraph. 502 U.S. 426-427.

response to the Bidding Procedures Order within ten days after the entry of the Bidding Procedures Order, the matters raised in the City Letter are moot and the Bidding Procedures Order constitutes the law of the case.

Further, the Court notes that no party has moved the Court to reconsider the rulings made in the Bidding Procedures Order, nor, to the Court's knowledge has any party commenced an appeal with respect to the same. Except for the limited change to permit competing bids to be substantially similar to the GSRG Agreement as opposed to identical, the bidding procedures drafted by Ableco and GSRG were approved.

To conclude, the Trustee has complied with the applicable provisions of § 363(f) and, with no Dewsnup limitation, the Trustee may therefore sell the Steel Mill Assets free and clear of liens and other interests under § 363(f).

Having established that § 363(f) authorizes the sale free and clear of the liens and other interests in such property, the Court now turns to the issue of whether the Trustee should be authorized by this Court to do so.

The Second Circuit established the leading authority for approving a sale in Equity Sec. Holders v. Lionel Corp. (In Re Lionel), 722 F.2d 1063 (2nd Cir. 1983). In Lionel, the Circuit held the proper standard to use when considering a proposed motion to sell is the business judgment test. It is this standard which has been adopted by the vast majority of courts. See also, U.S. ex rel. Rahman v. Oncology Associates, P.C., 269 B.R. 139 (D. Md. 2001) (The standard to be applied by a court in determining whether or not to approve the disposition of property is whether the Trustee exercised sound business judgment.) Under this standard, the Trustee has the burden to establish sound business reasons for the terms of the proposed sale. Factors for the Court to consider in whether to

approve the sale include: (1) any improper or bad faith motive, (2) price is fair and the negotiations or bidding occurred at arm's length, (3) adequate procedure, including proper exposure to the market and accurate and reasonable notice to all parties in interest. The Trustee is responsible for the administration of the estate and his or her judgment on the sale and the procedure for the sale is entitled to respect and deference from the Court, so long as the burden of giving sound business reasons is met. In re Bakalis, 220 B.R. 525, 531-32 (Bankr. E.D.N.Y. 1998) (noting discretion accorded to trustee with regard to sale of assets).

The business judgment of the Trustee must be evaluated: (a) as to the propriety of the Sale Motion and the bid of GSRG embodied within the Sale Motion, (b) as to the preparation for and conduct of the auction, and (c) as to the Trustee's determination of the highest and best bid received.

The Court finds that the Trustee's decision to sell the Steel Mill Assets was sound given the fact that this is a Chapter 7 case and given the prior unsuccessful marketing of the Steel Mill Assets both by public auction in May of 2001 (at which time reserve prices were not met for these particular assets), and by informal sales efforts involving steel industry participants and bidders aware of the Steel Mill Assets as a result of the marketing in connection with the May, 2001, public auction.

The Court finds that the Trustee's initial decision to sell the Steel Mill Assets to GSRG for the amount of $5 million was sound given the unsuccessful prior marketing efforts referred to immediately above, and given that the $5 million purchase price was roughly equivalent to the percentage of appraised value that was realized for the many assets that did sell in the May, 2001, public auction.

The Court finds that the Trustee complied with the notice and advertising procedures specified by the Court in the Bidding Procedures Order. The property was properly exposed to the

27

marketplace thereby allowing maximization of interest in bidding on the assets.

The Court further finds that there was no collusion or bad faith motive on the part of the Trustee or any bidder in connection with the Sale Motion, and that all negotiations and bidding occurred at arms-length. The Court did note in the Bidding Procedures Order the close interconnection between Ableco, Gulf States Steel, and GSRG, but no party has suggested any collusion.

The auction was conducted as contemplated in the Bidding Procedures Order. Parties were allowed to submit initial bids with accompanying contracts, which were substantially similar to the contract with GSRG. At the auction, competing bids were made by two bidders, GSRG and Park.

GSRG, as stated in the findings of fact, objected to the qualifying bid of Park for a variety of reasons. The Court finds these objections are without merit. Park submitted its bid in conformance with the Sale Motion, the Bidding Procedures Order, and the bidding procedures prescribed therein. GSRG's objection to Park's qualified bid on the basis that Park's modified contract allowed them to exclude certain property the Trustee sought to sell is a red herring. The Court notes that this right was agreed to at the bidding procedures hearing. This understanding was included in the Bidding Procedures Order wherein this Court held "As clarification of such Bidding Procedures, the successful bidder may chose to take title to less than all of the Steel Mill Assets, without deduction from the price." Bidding Procedures Order ¶ 3. Thus, this objection is without merit.

Further, GSRG was not being required to take title to all of the debtor's remaining assets. They had already elected to "pick and choose" which property they wanted to keep and which property they wanted to leave to the trustee to be abandoned. Any requirement that any other bidder must take the same property as determined by GSRG defies logic. As GSRG could make an

28

independent analysis of which property it desired, other parties could, and did, make their own determination. As long as the purchase price was not diminished by the selection, it was in the best interests of the estate to allow the potential bidders to determine to their own satisfaction which property they sought to purchase.

As for the other alleged deficiencies argued by GSRG to the Park bid, the Court points out these issues were not contained in the actual modified contract, but instead were mentioned in the letter to the Trustee accompanying the modified contract. See Trustee's Exhibit B. Even if the terms were in the modified contract, the Court finds the changes either de minimis, as with respect to the closing day from 60 to 70 days, or vague, as with respect to the mention of conditions of the Bankruptcy Court. As such, the Objection of Gulf States Reorganization Group, Inc. to Consideration of Bid by Gadsden Industrial Park, LLC, and Motion to Disallow the Same is overruled and denied. Additionally, the determination of what constituted a qualifying bid was left to the sound discretion of the Trustee. Like the Court, the Trustee rejected these arguments by GSRG and this Court finds no abuse of discretion.

This takes us to the final issue to be determined by the Court, whether the Trustee exercised sound business judgment in the selection of the highest and best bid for the Steel Mill Assets. This determination is complicated by the various protests that have arisen out of the auction process and the fact that the Trustee was presented with the non-conforming GSRG Credit Bid.

The City of Gadsden, the Objecting Bondholders, the United Steel Workers of America and GSRG all urge that the Trustee and the Court look to factors other than benefit to the estate in determining the highest and best bid. They believe that factors such as the number of jobs created in the local community as a result of a given bid, the effect on the community of a given bid,

environmental issues presented by the different bids, and the preferences of the local government of one bidder over another should be considered by the Court and the Trustee in addition to the purchase price and the benefit to the estate of one bid versus another.

The United Steel Workers of America cite cases in support of the above proposition. However, these cases, by and large, involve instances where courts have authorized the acceptance of the lower of competing bids because the lower bid provides greater benefit to the estate than the higher bid. See In re Bakalis, supra; In re After Six, Inc., 154 B.R. 876 (E.D. Penn. 1993) (Court ordered highest dollar amount bid accepted despite committee's preference for a lower amount bid that included a promise to employ debtors' former employees).

Despite the concerns of City of Gadsden, the Objecting Bondholders, the United Steel Workers of America and GSRG, the Court reminds the parties, that the Trustee, not the Court, is selling this property. As stated in 11 U.S.C. § 704, one of the duties of the trustee is to "collect and reduce to money the property of the estate. . ..." "In enacting the Bankruptcy Code, Congress expressed its specific intent that judges of the United States Bankruptcy Court should not participate in the administration of bankruptcy estates." In re Landscape Properties, Inc., 100 B.R. 445, 447 (Bankr. E.D. Ark.1988); In re NEPSCO, Inc., 36 B.R. 25 (Bankr. D. Me.1983). As stated above, the Trustee has 'great judicial deference' in deciding which bid to accept as the best and highest bid. Bakalis, 220 B.R. at 532. Even though the discretion is not without limit, a Court should not step in and assume a role and responsibility properly placed in the hands of the trustee.

As between the two bidders, Park and GSRG, the Bidding Procedures Order required overbids "at least $50,000 higher than the then existing highest or better Bid." The nonconforming bid by GSRG prevented the Trustee from determining if the bid exceeded the prior bid by $50,000,

30

as required in the Bidding Procedures Order. Such a determination required facts not available to the Trustee, including the final amount of debt owed to Ableco and the full amount payable to the Trustee for commission and professional fees.

Furthermore, the non-conforming bid relied on an inapplicable statute. Since several claims have a higher priority than the claims held by GSRG, any application of an offset by § 363(k) would violate those priorities. In addition to paying Ableco in full, the claims of taxing authorities would have to be paid in full, along with the liens of the Preferred Trade Vendors, in the approximate amount of $7.5 million, before any proceeds could be applied to the mortgage debt.

Finally, as stated earlier, neither GSRG nor the Objecting Bondholders can act for the bondholders as a whole. Both these entities control only a portion of the bondholders. The Indenture Trustee is the record holder of the mortgage, and it did not join this specious proposal.

This leaves the $6.3 million bid of Park and a lower bid of GSRG. Between these bids, the Trustee chose the $6.3 million bid of Park. Obviously, this is the higher bid, allowing the best return for the estate. The United Steel Workers of America argue the Court, and presumably the Trustee, should not look at just the highest bid. This argument is made even after citing In re Gil-Bern Indus., Inc., 526 F.2d 627 (1st Cir. 1975) which held a trustee's duty is to maximize the return to a bankruptcy estate. See also In re Bakalis, 220 B.R. 525 (Bankr. E.D.N.Y. 1998). The First Circuit, as does this Court, acknowledged that the "highest bid is not always the best bid." Gil-Bern at 629. However, this is not a situation where the higher bid has complications which might render it not the best bid. For example, in most respects the Park bid is almost identical to the GSRG bid, with respect to the benefit to the estate. The Park bid contains no contingencies which might render it less desirable to the estate than the GSRG bid. The Park bid will not take substantially longer to

31

consummate than the GSRG bid. Thus, from an estate point of view, the Court can find no abuse of discretion with the trustee's decision to accept the Park bid over the GSRG bid. Finally, most of the cases cited by the Steelworkers Union did not involve a court forcing a trustee or a debtor-in-possession to take a lower bid. In re After Six Inc., 154 B.R. 876 (Bankr. E.D. Pa. 1993) (court sustained debtor's decision to go with higher offer); In re Bakalis, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) (court sustained trustee's decision to go with lower bid). As held in In re Landscape Properties, Inc., 100 B.R. 445 (Bankr. E.D. Ark.1988):

> In deciding whether to approve a purchase offer or in choosing which
> is the better offer when competing offers have been made, courts
> generally consider factors in addition to a higher dollar amount. It has
> been held, however, that in a liquidation case it is "legally essential" to
> approve the highest offer, although this statement assumes that the
> offers and offerors are in all other respects comparable.

Id. at 447 (citing In re Flannery, 11 B.R. 974, 977 (Bankr. E.D. Penn.1981).

Here, from the perspective of the estate, these offers and offerors are in all respects comparable. As such, the Trustee's decision to accept the higher and better bid of Park is consistent with sound business judgment, and is due to be approved. See Equity Sec. Holders v. Lionel Corp. (In re Lionel), 722 F.2d 1063 (2nd Cir. 1983).

## ORDER

For the foregoing reasons, it is by the Court hereby

**ORDERED, ADJUDGED AND DECREED:**

1.    That the Sale Motion is due to be, and is hereby, **GRANTED.**

32

09/25/2002   21:30   HARRY F. LONG, ATTORNEY AT LAW

2.      That the bid of Gadsden Industrial Park, L.L.C. for the Steel Mill Assets is the highest and best bid received by the Trustee; and the trustee's proposed sale of the Steel Mill Assets to Gadsden Industrial Park, L.L.C. free and clear of all liens, claims and other interests as specified in the Sale Motion and the Bidding Procedures Order for $6,300,000 is due to be, and is hereby, **APPROVED.**

3.      The Trustee is hereby **AUTHORIZED, ORDERED, and DIRECTED** to consummate and close the sale of the Steel Mill Assets to Gadsden Industrial Park, L.L.C. pursuant to the Sale Motion and Bidding Procedures Order free and clear of all liens, claims and other interests as specified in the Sale Motion and the Bidding Procedures Order for $6,300,000.

4.      Park is a good faith purchaser pursuant to 11 U.S.C. §363(m); and Park is not a successor in interest to the debtor or the Trustee.

5.      As specifically provided in the Bidding Procedures Order, Gadsden Industrial Park, L.L.C. may in its sole discretion elect, at any time prior to the consummation and closing of the sale of the Steel Mill Assets, to exclude any portion of the Steel Mill Assets from the sale and shall not be required to purchase any such excluded items; provided, however, that the purchase price shall remain fixed at $6,300,000 and shall not be adjusted in response to any such election to exclude any items from the sale at or before closing.

6.      That except for the objection of ICON with respect to the Mesta Grinder which objection is **SUSTAINED**, all other objections to the Sale Motion are due to be, and are hereby, **OVERRULED.**

7.      That Trustee's decision to accept the bid of Gadsden Industrial Park, LLC for the Steel

Mill Assets is the highest and best bid received by the Trustee was appropriate under the circumstances and meets the "Business Judgment" standard.

8.   Nothing in this Order releases or nullifies any liability to a governmental entity under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order.  This Order is not intended to prohibit any environmental protection agency from enforcing its regulations in and to any purchaser for future compliance.

9.   Further, there appear to be two Uniform Commercial Code UCC-1 forms filed with a lien upon certain property as identified at the Bidding Procedures hearing. The Trustee, at the hearing, stated that said liens had not been addressed specifically and therefore this Court concludes that this sale must be conducted subject to those particular creditor's rights to the collateral.

10.  The Clerk is hereby directed to post a copy of this Order on the Clerk's website at www.alnb.uscourts.gov (click on National Interest Cases) pursuant to the General Order previously entered in this case.

11.  A copy of this order shall be sent to each of the following (which shall be sufficient service and notice hereof): all parties in interest, and all parties listed on the sign-in sheet for the September 16, 2002 hearing.

Signed this _____26th_____ day of September, 2002.


James S. Sledge
United States Bankruptcy Judge


34

# EXHIBIT B

DEC 03 2002 11:00 FR PM-J        205 458 0035 TO 14129636378;0111 P.02
                                                        DEC 03 '02 11:57AM

*Exhibit*
*A - 1*
*A - 2*
*Judges order*
*Equipment List*

STATE OF ALABAMA )

COUNTY OF ETOWAH )

### TRUSTEE'S BILL OF SALE

**KNOW ALL MEN BY THESE PRESENTS:** that,

**WHEREAS, JAMES G. HENDERSON,** as the duly and qualified and acting Trustee of

the Bankruptcy Estate of **GULF STATES STEEL OF ALABAMA, INC.,** bankruptcy case

number **99-41958,** filed in the United States Bankruptcy Court, Northern District of Alabama,

Eastern Division, did offer the within described property for sale; and,

**WHEREAS, GADSDEN INDUSTRIAL PARK, LLC,** agreed to pay the sum of Six

Million One Hundred Fifty Thousand and No/100 Dollars ($6,150,000.00) for the purchase of

the below described personal property; and,

**WHEREAS,** this instrument is in accordance with the terms of and duly authorized by 11

U.S.C. Section 363, and 11 U.S.C. Section 102(1); and,

**WHEREAS,** the parties acknowledge and agree that for purposes of completing the

Asset Purchase Agreement ("Agreement") between the parties dated September 30, 2002, the

order of sale related to the Agreement and issued by the U. S. Bankruptcy Court for the Northern

District of Alabama dated September 27, 2002, ("Order"), is final, and that in the event the order

should later be determined not to have been final, the parties hereto are acting in good faith upon

the finality of such order.

**NOW, THEREFORE,** by virtue of and in execution of the power granted to him by the

Bankruptcy Code and the Findings of Fact and Conclusions of law and Order Granting Trustee's

Motion for an Order Authorizing Sale of Property of the Estate Free and Clear of Liens and other

interests entered September 27, 2002, signed by Judge James S. Sledge, and of every other power

**EXHIBIT**

B

and authority granted to him, hereto enabling, and in consideration of the sum of Six Million One

Hundred Fifty Thousand and No/100 Dollars ($6,150,000.00) to the Trustee paid by **GADSDEN**

**INDUSTRIAL PARK, LLC**, the receipt of which is hereby acknowledged, **JAMES G.**

**HENDERSON**, as such Trustee does hereby **GRANT, BARGAIN, SELL and CONVEY, AS**

**IS**, unto **GADSDEN INDUSTRIAL PARK, LLC**, all right, title and interest which the

bankrupt Debtor had on the date of the commencement of the proceedings in bankruptcy on the

following property referenced in the Trustee's Motion For An Order Establishing Bidding And

Other Procedures In Connection With Sale Of Property Of The Estate Free And Clear Of Liens

And Other Interests And Motion For Authority For Such Sale attached hereto as **EXHIBIT "A-**

**1"** and made a part hereof by reference, and more particularly described as **EXHIBIT "1"** to the

Asset Purchase Agreement, attached hereto as **EXHIBIT "A-2"** less and except those items set

forth on an exclusion list, prepared by the purchaser, as provided by the Court's Order, and

included in the contract of sale, which is attached hereto as **EXHIBIT "B"**, and made a part

hereof by reference.

 **TO HAVE AND TO HOLD** all the right, title and interest in and to said property unto

the said **GADSDEN INDUSTRIAL PARK, LLC**, and to its assigns forever.

 **IN WITNESS WHEREOF**, I have hereunto set my hand and seal on this the 3·d

the day of December, 2002.
 10:30 A.M.

 

 

JAMES G. HENDERSON, as
Trustee and only as Trustee of
the Bankruptcy Estate of
Gulf States Steel of Alabama,
Inc., Case Number 99-41958

STATE OF ALABAMA       )

COUNTY OF JEFFERSON  )

   I, the undersigned, a Notary Public in and for said County and State, do hereby certify that
JAMES G. HENDERSON, whose name as Trustee is signed to the foregoing Trustee's Bill of
Sale, and who is known to me, acknowledged before me on this day, that, being informed of the
contents of said Trustee's Bill of Sale, he, in his capacity as Trustee, executed the same
voluntarily and with full authority on the day the same bears date.

   Given under my hand and official seal on this the _____ day of December, 2002.


   _____
   NOTARY PUBLIC

   NOTARY PUBLIC STATE OF ALABAMA AT LARGE
   MY COMMISSION EXPIRES: Mar. 12, 2003
   BONDED THRU NOTARY PUBLIC UNDERWRITERS

This instrument was prepared by:


   JAMES G. HENDERSON
   Attorney at Law
   800 Financial Center
   Birmingham, AL 35203

## EXHIBIT "B"
### Purchaser's Itemization of Excluded Items from Sale

1. With reference to the property identified in "ATTACHMENT 5 - INVENTORY," Purchaser excludes:

    A. All miscellaneous other materials.

    B. All by-products of production other than kish and 420,000 cubic yards of slag which are located on the Excluded Real Property as is described on Exhibit B to the deed from Seller to Purchaser of even date herewith, together with a reasonable period of time to remove such items.

2. Item Reference #6074 from "Schedule One to Trustee's Bill of Sale Spreadsheet," being pump facility, located on lagoon, incl. corrugated metal pump house, approx 10' X 14' X 10', assumed incl. interior pump w/drive, etc., [C] improvements.

3. Item Reference #6075 from "Schedule One to Trustee's Bill of Sale Spreadsheet," being storage tank, appearance for all storage, located near lagoon, indicated tank env11, carbon steel, approx. 7500-gal., incl. containment wall, access ladder, piping, etc. [C].

4. Item Reference #6076 from "Schedule One to Trustee's Bill of Sale Spreadsheet," being skimmer system, installed in lagoon, w/drive, pump, etc., incl. platform, electrics.

5. Item Reference #6077 from "Schedule One to Trustee's Bill of Sale Spreadsheet," being storage tank, used oil, located near lagoon, approx. 15000-gal., carbon steel, horiz., incl. pump, containment wall, access ladder, etc., asstd. auxiliary houses, pump house, etc.

NORMAN.WOOD.KENDRICK&T   ID:205-251-5479          SEP 30'02   16:04 No.007 P..∪∪
                                                             SEP 30 '02  05:01PM

## SCHEDULE ONE TO TRUSTEE'S BILL OF SALE

Explanation of Spreadsheet:

Reading from left to right, the far left "Ref. #" column contains a reference number for each item.

The "quantity" column (QTY) indicates the count of the item described to the far right. The term "lot" considers a group of items as one.

The "Area" column represents the area code where the item can be located. The code can be interpreted by referring to the attached code directory.

The "description" column located to the far right provides a general description of the item. Referenced attachments for the hot-strip mill (Ref.# 5269), metallurgical arc furnace system (Ref.# 5948), plate mill (Ref.#4690), and shear line (Ref.#4826) are located on Pages 9 through 12 of the accompanying spreadsheet.

Gulf States Steel – Code Directory

| Code | *Color Code (if applicable) | Code Description | Refer to Pages |
|------|------|------|------|
| AD | Yellow | Administration Building | 1 |
| CC | Red | Continuous Caster (Including all spare segments and parts) | 1 |
| CS |  | Cold Strip Shipping | 1 |
| DS | Red | DSC (Demag Slab Caster) | 1 |
| EG | Yellow | Engineering Building | 2 |
| HS | Blue | Hot Strip Mill | 2-3 |
| MB |  | Old Machine Shop and other shops | 3 |
| ME | Red | Melt Shop (BOF) | 3-4 |

NORMAN,WOOD,KENDRICK&T   ID:205-251-5479          SEP 30'02   16:04 No.007 P. .
                                                             SEP 30 '02 05:01PM

| MS | Blue  | Maintenance Spares   | 4-5 |
| PM | Green | Plate Mill           | 5-6 |
| PP | Red   | Power Plant          | 6-7 |
| RO | Blue  | Roll Shop            | 7   |
| RR |       | Railroad Equipment   | 7   |
| VE |       | Vehicles             | 7   |
| YD |       | Yard/Plant General   | 7-8 |

NORMAN.WOOD.KENDRICK&T   ID:205-251-5479          SEP 30'02    16:04 No.007 P.
                                                              SEP 30 '02  05:01PM

| REF. # | QTY | AREA | DESCRIPTION |
|--------|-----|------|-------------|
| 1000 | LOT | AD | OFFICE FURNITURE, INCL., BUT NOT LIMITED TO: (30) FILE CABINETS - 5 DRAWER LEGAL, (16) FILE CABINETS - 5 DRAWER LETTER, (13) FILE CABINETS - 4 DRAWER LEGAL, (69) FILE CABINETS - 4 DRAWER LETTER, (6) FILE CABINETS - 3 DRAWER LETTER, (8) FILE CABINETS - 2 DRAWER LEGAL, (13) FILE CABINETS - 2 DRAWER LETTER, (36) DESKS, (64) CHAIRS, (9) CABINETS - 2 DOOR, (6) BOOKCASE - 3 TIER, (1) SHREDDER, (3) CONFERENCE TABLES, (2) SAFES, (1) CHECK BURSTER |
| 1008 | 1 | CC | BRIDGE CRANE #151 35 TON 18' SPAN - CASTER FLOOR * W/ CASTER |
| 1009 | 1 | CC | BRIDGE CRANE #152 35 TON 34'8"SPAN - CASTER MOLD/SEGMENT |
| 5959 | 1 | CC | BRIDGE CRANE #164, ALLIANCE, UTILIZED FOR TEAMING AISLE FOR CONTINUOUS CASTER, DBL. GIRDER, CAB OPERATED, REFURBISHED BY MORGAN, 275-TON, W/AUXILIARY HOIST, PER INFORMATION PROVIDED, OBSERVED IN YARD |
| 6084 | 2 | CC | BRIDGE CRANES #s 149 & 150, MFG. & MDL. UNREADABLE, MILL DUTY CRANE, DBL. GIRDER, APPROX. 50-TON CAP., MAIN HOIST UTILIZING (2) 25-TON CAP. DRUMS, (1) 25-TON AUXILIARY HOIST, W/CRANE MAGNET, ELECTRO NEUTRIFIER, EA. CRANE W/BLAN-KNOX APPROX. 50-TON SCISSOR ACTUATING SLAB LIFT UNIT, REMOTE CONTROLLED, [C+] *IMPROVEMENTS |
| 6085 | 1 | CC | VERTICAL MILLING MACHINE, LAGUN, MDL. FBA-1800, S/N UNREADABLE, APPROX. 16" X 72" T-SLOT TABLE, SHOP BUILT SPLASH PAN ADDED TO TABLE, W/H.D. WORK HOLDING FIXTURE, W/POWER FEEDS, [C] |
| 6086 | 1 | CC | JIB CRANE, ABELL-HOWE, 3-TON CAP., COLUMN MTD., APPROX. 20' SPAN, W/YALE 3-TON CHAIN HOIST, PENDANT CONTROL, POWER TROLLEY, [C] |
| 1014 | 1 | CS | BRIDGE CRANE #123 30/5 TON P&H 106' SPAN - LOCATED IN COLD STRIP |
| 3143 | 7 | DS | COMPUTER PROCESSES, ALLEN-BRADLEY, PLC5, TYPE 540E, ETHERNET COMMUNICATIONS *W/CONTINUOUS CASTER |
| 3144 | 2 | DS | COMPUTERS, GATEWAY 2000, MDL. P5-133, MDL. P6-66, UPGRADED 233-MHZ, W/COLOR MONITOR, KEYBOARD, MOUSE, POWER SERIES PANELMATE TOUCH CONTROL PANEL, CUTLER-HAMMER *W/CONTINUOUS CASTER |
| 3145 | 5 | DS | COMPUTER CONTROLLERS, CUTLER-HAMMER, PANELMATE, COLOR, TOUCH SCREEN CONTROL *W/CONTINUOUS CASTER |

NORMAN.WOOD.KENDRICK&T   ID:205-251-5479          SEP 30'02   16:05 No.007 P.
                                                            SEP 30 '02 05:01PM

| REF.# | QTY | AREA | DESCRIPTION |
|---|---|---|---|
| 3146 | 1 | DS | COOLING TOWER, PSYCHROMETRIC, S/N 94-117, SGL. FAN, INCL. ALL PIPING, PUMPS, ETC., [C] *W/CONTINUOUS CASTER |
| 5957 | 1 | DS | CONTINUOUS CASTER, DEMAG, STRAND SLAB CASTER, INDICATED 1983, APPROX. 68" W X 8" NOMINAL SLAB CAP., INCL., BUT NOT LIMITED TO: AUTOMATED TUNDISH STAND, ROTATING, W/DUAL TUNDISH LADLES, COMPUTERIZED CONTROLS, WORK AREA & PROCESS ROOM CONTROLS, MOLD, MOLD OSCILLATOR, MULTI-LEVEL POURING MOLD, W/CHUTE, 13-SEGMENT (13TH SEGMENT ADDED 1997), W/ALL DRIVES, CASTERS, GEGA GAS CUT-OFF (GEGA TORCH SYSTEM REPLACED 1998) TORCH TRAVELING CUT-OFF, TWIN TORCH HEAD, EXIT ROLLER FRAME, COOLING BED, W/POWER W/CASTERS, INCL. ELECTRICAL SWITCHGEAR, TORCH CONTROL ROOM, W/OPERATOR'S CONTROLS & VIEW MONITORS, WATERTREATMENT SYSTEM, RECIRCULATION PUMPS, PIPING, HYD. SYSTEM, ALLEN-BRADLEY PLC5 CONTROLS, CONSIDERED STATE-OF-THE-ART, INCL. SPARE SEGMENTS, MOLDS, ETC., HEAVILY INSTALLED, NOTE: CASTER ORIGINALLY INSTALLED NEW IN SPAIN, SELDOM USED, PURCHASED & REMOVED INTACT TO GULF STATES |
| 5958 | 2 | DS | BLOWERS, HIGH VELOCITY, 150-HP, HEAVY STRUCTURAL FRAME, W/DUCTING, DISCHARGE STACKS, STEAM EXHAUST, RELATED SWITCHGEAR, MOTOR CURRENT CONTROL, ETC., [C] |
| 1015 | LOT | EG | OFFICE FURNITURE, INCL., BUT NOT LIMITED TO: (2) FILE CABINETS - 5 DRAWER LEGAL, (27) FILE CABINETS - 6 DRAWER LETTER, (2) FILE CABINETS - 4 DRAWER LEGAL, (90) FILE CABINETS - 4 DRAWER LETTER, (3) FILE CABINETS - 3 DRAWER LEGAL, (7) FILE CABINETS - 3 DRAWER LETTER, (3) FILE CABINETS - 2 DRAWER LEGAL, (21) FILE CABINETS - 2 DRAWER LETTER, (26) DESKS,(6) DRAFTING TABLES, (66) CHAIRS, (12) CABINETS - 2 DOOR, (15) BOOKCASES, (2) SHREDDER, (5) CONFERENCE TABLES - ROUND/RECTANGLE, (16) FOLDING TABLES, (1) CREDENZA, (42) SHELVING SECTIONS - METAL, (1) PAPER CUTTER - MANUAL, (1) LADDER - METAL, (1) BLUEPRINT COPIER, (1) MICROFICHE READER/PRINTER |
| 1003 | 1 | HS | BRIDGE CRANE #120, 20/10 TON P&H 11820 60' SPAN - BM BILLET YARD *W/ HOT STRIP |
| 1004 | 1 | HS | BLAW KNOX SPREADER - DOUBLE CONVERT YARD * W/ HOT STRIP |
| 1005 | 1 | HS | BRIDGE CRANE #144 15 TON CLEVELAND #183801 - HS FURNACE REPAIR SHOP * W/ HOT STRIP MILL |
| 3148 | 6 | HS | COMPUTERS, PENTIUM, DELL, W/COLOR MONITOR, KEYBOARD, MOUSE *W/HOT STRIP MILL |
| 3149 | 2 | HS | COMPUTERS, DIGITAL, ALPHA SERVER 2100A, 4/275 *W/HOT STRIP MILL |
| 3150 | 5 | HS | COMPUTER TERMINALS, DIGITAL, COLOR, W/KEYBOARD *W/HOT STRIP MILL |
| 3151 | 1 | HS | COMPUTER, DIGITAL, FILE SERVER *W/HOT STRIP MILL |
| 3152 | 1 | HS | COMPUTER, DELL, PENTIUM, W/MONITOR, KEYBOARD, MOUSE *W/HOT STRIP MILL |
| 3153 | 1 | HS | COMPUTER PRINTER, HEWLETT-PACKARD, DESKJET 1600CM *W/HOT STRIP MILL |
| 3154 | 1 | HS | COMPUTER NETWORK HUB, FOR FIBER OPTICS SYSTEM, INCL. LUCENT TECHNOLOGIES FIBER OPTIC TERMINATION SHELVES, HEWLETT-PACKARD SWITCHING HUBS, HEWLETT-PACKARD ADVANCE STACK SWITCHING, ETC., [C] |
| 3164 | 1 | HS | COMPUTER, 386, W/MONITOR, KEYBOARD, MOUSE, [O] |

NORMAN.WOOD.KENDRICK&T   ID:205-251-5479          SEP 30'02   16:06 No.007 P.⁞⁞
                                                            SEP 30 '02 05:01PM

| REF.# | QTY | AREA | DESCRIPTION |
|-------|-----|------|-------------|
| 5072 | 1 | HS | BRIDGE CRANE # 93, DBL. GIRDER, TOP-RIDING BRIDGE & HOIST, 40/15-TON CAP., CLEVELAND, CRANE #93, 92' SPAN, CAB OPER., OBSERVED IN OPER., [OC-] *IMPROVEMENTS |
| 5075 | 3 | HS | PUMPS, #1, #2 & #3, DESCALE PUMPS, EA, APPROX. 8", W/MANUAL VALVES, RELIANCE 2000-HP MOTOR DRIVE, LUFKIN GEAR REDUCER, [C+] *W/HOT STRIP MILL LISTED ELSEWHERE |
| 5077 | LOT | HS | MISCELLANEOUS, LOCATED THROUGHOUT AREA, INCL., BUT NOT LIMITED TO: ASSTD. HAND TRUCKS, MISC. STORAGE CABINETS, FURNITURE LOCATED IN CONTROL PANELS, ASSTD. SLINGS & CABLE, ETC. |
| 5078 | LOT | HS | SWITCHGEAR, SIEMENS-ALLIS, TO DRIVE DESCALE PUMPS *W/HOT STRIP MILL LISTED ELSEWHERE |
| 5079 | 1 | HS | BRIDGE CRANE, LOCATED IN MOTOR ROOM, CRANE #99, 50-TON CAP., 76' SPAN, SHEPARD-THOMASON NILES TOP RIDING BRIDGE & TROLLEY, CAB CONTROL, [OC-] *IMPROVEMENTS |
| 5082 | 1 | HS | BRIDGE CRANE, 7-1/2-TON, NORTHERN, 6' PENDANT CONTROL, APPROX. 20' SPAN, DBL. GIRDER, (LOCATED IN SMALLER MOTOR REPAIR AREA), [D] *IMPROVEMENTS |
| 5086 | LOT | HS | CABINETS, INCL., ASSTD. PREFABRICATED & SHOP WELDED CABINETS, USED FOR MISC. STORAGE, INCL. ASSTD. LOCKERS, FURNITURE, ETC., ALL LOCATED IN SMALL MOTOR REPAIR ROOM |
| 5092 | LOT | HS | FURNITURE, INCL. ASSTD. STORAGE CABINETS, CHAIRS, ETC., LOCATED THROUGHOUT, NOT OTHERWISE LISTED OR CONSIDERED |
| 5102 | 2 | HS | TABLES, 30" X 6-8', METAL, FOLDING, AVG. |
| 5103 | 5 | HS | CHAIRS, METAL, FOLDING |
| 5104 | 5 | HS | DESKS, DBL. PED., METAL BASE, 36" X 72" |
| 5106 | 2 | HS | CHAIRS, SWIVEL, TUBULAR METAL FRAME |
| 5107 | 8 | HS | FILES, 4-DWR., LETTER, W/LOCK |
| 5108 | 3 | HS | CHAIRS, SIDEARM, TUBULAR METAL FRAME, [O] |
| 5109 | 1 | HS | TABLE, 3' X 6', [O] |
| 5111 | 5 | HS | CHAIRS, STACKING, CHROME FRAME, FABRIC UPH. |
| 5112 | 2 | HS | CHAIRS, POSTURE |
| 5118 | 16 | HS | LOCKERS |
| 5120 | 1 | HS | CABINET, 2-DR., METAL, STORAGE, 7' |
| 5268 | 1 | HS | BRIDGE CRANE, LOCATED IN DE-SCALE PUMP ROOM, APPROX. 15-TON CAP., DBL. GIRDER, RIVETED, CONVERTED FROM CAB CONTROL TO PENDANT CONTROL, APPROX. 45' SPAN, [OD+] *IMPROVEMENTS |
| 5269 | 1 | HS | HOT STRIP MILL, 54" - SEE ATTACHMENT 1 |
| 5341 | 1 | HS | BRIDGE CRANE, ALLIANCE, 125-TON, W/15-TON AUX. HOIST, #116, 92' SPAN, CAB OPERATED, [OC] *IMPROVEMENTS |
| 5349 | 1 | HS | ARC WELDER, LINCOLN, IDEALARC, MDL. R3R-500 |
| 5744 | 1 | MB | BRIDGE CRANE, 30-TON, W/5-TON AUX., VICTOR R. BROWN MFG., WILLOUGHBY, OH., DBL. GIRDER, RIVETED FISHBELLY, CAB OPERATED, P&H TROLLEY, 60' SPAN *IMPROVEMENTS |
| 6788 | 1 | MB | BRIDGE CRANE, 10-TON CAP., DBL. GIRDER, MFG. UNKNOWN, CAB OPERATED, 30' SPAN, TOP MTD. HOIST, [E] *IMPROVEMENTS |
| 1006 | 1 | ME | BRIDGE CRANE #131, 3 TON #10995 - LADLE RELINE * W/ MELT SHOP |
| 1010 | 1 | ME | BRIDGE CRANE #153 5 TON 1' LEGGED GANTRY - TUNDISH REPAIR AREA * W/ MELT SHOP |
| 1011 | 1 | ME | BRIDGE CRANE #102 150/25 TON ALLAINCE #5717 80'3" SPAN - ELECT FCE FLOOR - TUNDISH REPAIR |

NORMAN,WOOD,KENDRICK&T   ID:205-251-5479          SEP 30'02   16:07 No.007 P.--
                                                              SEP 30 '02  05:01PM

| REF. # | QTY | AREA | DESCRIPTION |
|---|---|---|---|
| 1012 | 1 | ME | BRIDGE CRANE #110 ALLIANCE #6820 80'3" SPAN - TUNDISH REPAIR |
| 4148 | 1 | ME | BRIDGE CRANE, ALLIANCE, 200/50/15-TON, 60' SPAN, CAB OPERATED, 4-GIRDER, DBL. HOIST, LADLE LIFTING HOOK *IMPROVEMENTS |
| 4171 | 1 | ME | TEEMING LADLE, 175-TON CAP., UNIT #31 |
| 4174 | 1 | ME | TEEMING LADLE, 175-TON CAP., UNIT #29 |
| 4179 | 1 | ME | TEEMING LADLE, 175-TON CAP., UNIT #19 |
| 4180 | 1 | ME | TEEMING LADLE, 175-TON CAP., UNIT #20 |
| 4182 | 1 | ME | TEEMING LADLE, 175-TON CAP., UNIT #32 |
| 4190 | 1 | ME | TEEMING LADLE, 175-TON CAP., UNIT #39 |
| 4445 | LOT | ME | MISCELLANEOUS ITEMS, LOCATED IN COMPUTER ROOM, INCL. BUT NOT LIMITED TO: ASSTD. DIGITAL PRINTERS, MISC. FURNITURE, ETC., (PRINTERS NOT IN USE AT INSP.) |
| 4446 | 10 | ME | CABINETS, 2-DR., METAL, STORAGE, 7' |
| 4447 | 1 | ME | BRIDGE CRANE, ALLIANCE, 250/50/15-TON CAP., CAB CONTROLLED, COMP. W/HOOKS FOR LADLE HANDLING, 60' SPAN, OBSERVED IN OPERATION, [OC] *IMPROVEMENTS |
| 4448 | 1 | ME | BRIDGE CRANE, ALLIANCE, 200/50/15-TON CAP., CAB CONTROLLED, COMP. W/HOOKS FOR LADLE HANDLING, 60' SPAN, [OC], OBSERVED IN OPERATION *IMPROVEMENTS |
| 4450 | 2 | ME | ARC WELDERS, HORIZ. MOTOR GENERATOR TYPE, [D] |
| 4451 | 1 | ME | BRIDGE CRANE, ALLIANCE, 200/50/15-TON CAP., DBL. GIRDER, CAB OPERATED, 60' SPAN, OBSERVED IN OPERATION, [OC] *IMPROVEMENTS |
| 4464 | 1 | ME | JIB CRANE, ABELL-HOWE, 1-TON, FLOOR COLUMN, W/HOIST |
| 4467 | 1 | ME | ARC WELDER, HOBART, MDL. D-403P, W/GAS ENGINE, SKID MTD., [D] |
| 4473 | 1 | ME | JIB CRANE, APPROX. 3-TON, PARTIALLY MTD. TO BLDG. SUPPORT, W/HOIST, PENDANT CONTROL, [OC] |
| 4474 | LOT | ME | LOCKERS, LOCATED THROUGHOUT AREA |
| 4478 | 1 | ME | PIPE THREADER, RIDGID, MDL. 535, S/N 39766, W/ACCESS. |
| 4479 | 1 | ME | GRINDER, 8", BENCH TYPE, DAYTON, [C] |
| 4480 | 1 | ME | GRINDER, CINCINNATI, H.D., APPROX. 12" GRINDING WHEELS |
| 4482 | 1 | ME | DRILL PRESS, CLAUSING, MDL. 2276, S/N 526576, COMP. W/8" PALMGREN MACHINE VISE |
| 4494 | 1 | ME | BRIDGE CRANE, CONSIDERED 20-TON CAP., APPROX. 60' SPAN, DBL. GIRDER, COMP. W/MAGNET, USED FOR LOADING SCRAP INTO SCRAP BUCKETS, CAB CONTROL, [OD] *IMPROVEMENTS |
| 4513 | 1 | ME | SCALE, RAILROAD TRACK SCALE, 300-GROSS TON CAP., 4-SECTION DESIGN, EXTREME DIFFICULTY OF MARKETABILITY UPON REMOVAL, VALUE CONSIDERED IN PLACE ONLY |
| 4514 | 1 | ME | SCALE, RAILROAD TRACK SCALE, 300-TON CAP., 4-SECTION DESIGN, EXTREME DIFFICULTY OF MARKETABILITY UPON REMOVAL |
| 4515 | 2 | ME | LOADING STANDS, FOR LOADING LADLES FROM BOF, EA. PARTIALLY PIT MTD., COMP. W/MOTOR DRIVES, HORIZ. TRANSFER ACTION *W/BOF SYSTEM |
| 4516 | LOT | ME | PREHEAT EQUIPMENT, INCL. BUT NOT LIMITED TO: ASSTD. LIDS, (VERT. MTD. IN FIRE BRICK), SUPPORT STANDS, GAS LINES, BURNERS, ETC., NOT OTHERWISE LISTED OR CONSIDERED, 100% DIFFICULTY OF MARKETABILITY UPON REMOVAL |
| 5886 | 1 | ME | COOLING TOWER, TWIN FAN *CONSIDERED W/BOF SYSTEM |
| 5948 | 1 | ME | METALLURGICAL ARC FURNACE SYSTEM, DEMAG - SEE ATTACHMENT 2 |

NORMAN,WOOD,KENDRICK&T   ID:205-251-5479          SEP 30'02   16:07 No.007 P....
                                                                   SEP 30 '02  05:01PM

| REF. # | QTY | AREA | DESCRIPTION |
|---|---|---|---|
| 5949 | 1 | ME | BAGHOUSE, MULTI-COMPARTMENT, STEEL, APPROX. 8' X 30' X 25', ELEVATED ON STRUCTURAL STEEL FRAME, W/CIRCULAR DUCTING, CHICAGO BLOWER, EXHAUST PIPING, ETC., BOTTOM MOTORIZED DISCHARGE, CONTROL HOUSE *W/LADLE METALLURGICAL FURNACE |
| 6001 | 77 | MS | PALLET RACKS, APPROX. 42" W X 8' L X 15' H, 3-TIER, ADJ., [C] |
| 6002 | 143 | MS | PALLET RACKS, APPROX. 42" W X 8' L X 15' H, 4-TIER, ADJ., [C] |
| 6003 | 1 | MS | LADDER, PORT., SAFETY, 13-STEP, W/HANDRAILS, [C] |
| 6005 | 39 | MS | MATERIAL RACKS, FREE-STANDING, UPRIGHT, DBL. SIDED, HEAVY DUTY STEEL, ADJ., W/4' ARMS, 3-TIER EA. SIDE, APPROX. 12' H, [C] |
| 6006 | 17 | MS | MATERIAL RACKS, FREE-STANDING, H.D., UPRIGHT, DBL. SIDED, HEAVY DUTY STEEL, ADJ., W/4' ARMS, 3-TIER EA. SIDE, APPROX. 16' H, [C] |
| 6007 | 16 | MS | MATERIAL RACKS, FREE-STANDING, H.D., UPRIGHT, SGL. SIDED, HEAVY STEEL, ADJ., W/4' ARMS, 3-TIER EA. SIDE, APPROX. 20' H, [C] |
| 6008 | 1 | MS | CRANE LIFTING DEVICE, VOEST ALPINE, 50-TON SLAB LIFTER, SCISSOR TYPE |
| 6009 | 15 | MS | SHELVING SECTIONS, METAL, CLOSED SIDES, APPROX. 12" X 36" X 84", MULTI-TIER, [C] |
| 6010 | 18 | MS | SHELVING SECTIONS, OPEN SIDED, BOLTED METAL, 18" X 36" X 84", MULTI-TIER, [C] |
| 6012 | 1 | MS | DESK, METAL, 30" X 60", LAMINATE TOP, [C-] |
| 6013 | 1 | MS | DESK, METAL, 30" X 60", LAMINATE TOP, [C-] |
| 6015 | 3 | MS | FILES, LETTER, METAL, 2-DWR., [C] |
| 6016 | 1 | MS | CHAIR, STRAIGHT BACK, VINYL UPH. BACK/SEAT, SIDEARM, [C] |
| 6017 | 1 | MS | CHAIR, SWIVEL, CASTERS, FABRIC UPH. BACK/SEAT, SIDEARM, [C-] |
| 6018 | 4 | MS | DESKS, METAL, 30" X 60", LAMINATE TOP, [C-] |
| 6019 | 1 | MS | CHAIR, SWIVEL, CASTERS, STENO, VINYL/FABRIC UPH., [C-] |
| 6020 | 1 | MS | PRINTER STAND, LAMINATE, 24" X 30", [C] |
| 6021 | 2 | MS | CHAIRS, SWIVEL, CASTERS, VINYL/FABRIC UPH., SIDEARM, [C-] |
| 6022 | 1 | MS | FILE, LETTER, METAL, 2-DWR., [C] |
| 6026 | 1 | MS | LOCKER, METAL, SGL. DR., [C] |
| 6027 | 1 | MS | STORAGE CABINET, METAL, 24" X 36" X 84", 2-DR., LOCKING, [C] |
| 6030 | 1 | MS | FILE, METAL, LETTER, 4-DWR., [C] |
| 6031 | 1 | MS | TYPING STAND, METAL, LAMINATE TOP, PORT., FOLDING WINGS, [C] |
| 6032 | 1 | MS | TYPEWRITER, IBM, WHEELWRITER 5, [C] |
| 6033 | 2 | MS | DESKS, METAL, 30" X 60", LAMINATE TOP, [O] |
| 6034 | 1 | MS | FILE, PORT., LETTER, [C] |
| 6036 | 1 | MS | CHAIR, SWIVEL, CASTERS, STENO, FABRIC/VINYL UPH., [C] |
| 6039 | 5 | MS | FILES, METAL, LETTER, 4-DWR., [C] |
| 6139 | 2 | MS | FILES, 4-DWR., LETTER, 28" D, [C] |
| 6140 | 1 | MS | DESK, CHROME BASE, 60" WOOD GRAIN LAMINATE TOP, [C] |
| 6141 | 2 | MS | CHAIRS, SECRETARIAL, 5-STAR BASE, AIR PISTON ADJ., FABRIC UPH., [C] |
| 6142 | 2 | MS | COMPUTER TABLES, DBL. PED., METAL BASE, 48" WOOD GRAIN LAMINATE TOP, [C] |
| 6143 | 2 | MS | CHAIRS, SWIVEL, 4-STAR METAL BASE, FABRIC UPH. SEAT, VINYL UPH. BACK, [C-] |
| 6144 | 1 | MS | DESK, CHROME BASE, 60" LAMINATE TOP, [C] |
| 6145 | 1 | MS | TABLE, METAL, FOLDING, 72" WOOD GRAIN LAMINATE TOP, [C] |
| 1002 | 1 | PM | IPRO MIC * W/ PLATE MILL |

NORMAN.WOOD.KENDRICK&T   ID:205-251-5479   SEP 30'02   16:08 No.007 P. ..
SEP 30 '02 05:01PM

| REF. # | QTY | AREA | DESCRIPTION |
|--------|-----|------|-------------|
| 3454 | 1 | PM | COMPUTER PRINTER, HEWLETT-PACKARD, LASERJET III |
| 3456 | 1 | PM | FACSIMILE MACHINE, BROTHER, INTELLIFAX 2500ML, LASERFAX, PLAIN PAPER, COPY SYSTEM |
| 3457 | 1 | PM | COMPUTER PRINTER, PANASONIC, 24-PIN, QUIET, MDL. KX-P2624 |
| 3458 | 1 | PM | COMPUTER PRINTER, HEWLETT-PACKARD, MDL. 2932A |
| 4604 | 6 | PM | FILES, METAL, LETTER, 5-DWR., [C] |
| 4605 | 1 | PM | TABLE, 30" X 60", LAMINATE SURFACE, W/LAMINATE BASE |
| 4608 | 1 | PM | PRINTER STAND, LAMINATE |
| 4609 | 4 | PM | DESKS, DBL. PED., METAL BASE |
| 4610 | 2 | PM | FILES, METAL, LETTER, 2-DWR., [C+] |
| 4611 | 1 | PM | FILE, 4-DWR., LEGAL, W/LOCK |
| 4612 | 1 | PM | TYPEWRITER, XEROX, 6015 MEMORYWRITER |
| 4614 | 4 | PM | CHAIRS, SWIVEL, TUBULAR METAL FRAME |
| 4615 | 1 | PM | WATER FOUNTAIN, OASIS, W/BUILT-IN REFRIGERATOR |
| 4616 | 1 | PM | REFRIGERATOR, HOTPOINT, APARTMENT STYLE |
| 4617 | 1 | PM | MICROWAVE OVEN, MAGIC CHEF |
| 4620 | 1 | PM | FACSIMILE MACHINE, OMNIFAX, MDL. G32, [C-] |
| 4622 | 1 | PM | TABLE, 30" X 36" |
| 4624 | LOT | PM | MISCELLANEOUS OFFICE ITEMS, INCL. BUT NOT LIMITED TO: ORGANIZERS, BULLETIN BOARDS, ETC. |
| 4641 | 2 | PM | EMERGENCY OXYGEN KITS, MSA |
| 4643 | 1 | PM | CHAIR, SWIVEL, EXEC., HIGH BACK, CHROME FRAME |
| 4644 | 2 | PM | DESKS, DBL. PED., METAL BASE, 36" X 72" |
| 4646 | 4 | PM | CHAIRS, SIDEARM, TUBULAR METAL FRAME, [C+] |
| 4647 | 2 | PM | FILES, 4-DWR., LETTER |
| 4648 | 1 | PM | TABLE, 30" X 60", [O] |
| 4651 | 1 | PM | CLOCK, WALL MTD. |
| 4652 | 4 | PM | CHAIRS, SIDEARM, TUBULAR METAL FRAME, [C+] |
| 4653 | 1 | PM | CHAIR, SIDEARM, TUBULAR METAL FRAME, [C+] |
| 4655 | 1 | PM | CHAIR, SWIVEL, EXEC., HIGH BACK |
| 4657 | 1 | PM | CALCULATOR, VICTOR, MDL. 1200S, DIGITAL READOUT ONLY |
| 4659 | 1 | PM | CLOCK, PYRAMID |
| 4662 | 1 | PM | BRIDGE CRANE, DBL. GIRDER, CAB OPERATED, LOCATED IN SLAB HANDLING/LOADING AREA, 92' SPAN, 50-TON CAP., (25-TON PER HOOK), INCL. MAGNET TYPE LIFTING DEVICE, [OC-] *IMPROVEMENTS |
| 4673 | 1 | PM | BRIDGE CRANE, DBL. GIRDER, UNIT #143, S/N 17615, CAB OPERATED, W/RADIO CONTROL, LOCATED IN SLAB HANDLING/LOADING AREA, 92' SPAN, 50-TON CAP., (25-TON PER HOOK), INCL. MAGNET TYPE LIFTING DEVICE |
| 4682 | 1 | PM | PUMP, PNEU., [C] |
| 4683 | LOT | PM | MISCELLANEOUS, LOCATED IN SLAB STORAGE & PREHEAT FURNACE AREA, INCL. BUT NOT LIMITED TO: HEATERS, FIRE EXTINGUISHERS, MISC. TABLES, FURNITURE, ETC. |
| 4690 | 1 | PM | PLATE MILL - SEE ATTACHMENT 3 |
| 4730 | 1 | PM | FACSIMILE MACHINE, OMNIFAX, MDL. G32, [O] |
| 4732 | LOT | PM | FURNITURE, ASSTD. CHAIRS, TABLES, ETC., LOCATED IN CONTROL PULPITS |

NORMAN,WOOD,KENDRICK&T   ID:205-251-5479          SEP 30'02   16:09 No.007 P.__
                                                              SEP 30 '02  05:01PM

| REF. # | QTY | AREA | DESCRIPTION |
|---|---|---|---|
| 4750 | 1 | PM | BRIDGE CRANE, 125/25-TON CAP., 92' SPAN, CAB OPERATED, MFD. BY CLEVELAND CRANE CO., S/N 16715, OBSERVED IN OPERATION, DBL. GIRDER, TOP RIDING BRIDGE & HOISTS, [OC] *IMPROVEMENTS |
| 4751 | 1 | PM | BRIDGE CRANE, 50/15-TON CAP., CRANE #136, DBL. GIRDER, W/TOP RIDING BRIDGE & HOISTS, W/PENDANT CONTROL, 92' SPAN, OBSERVED IN OPERATION, [C] *IMPROVEMENTS |
| 4752 | 1 | PM | TRANSFER CAR, PIT MTD., APPROX. 16' X 24', COMP. W/DEDICATED HYD. PUMP, W/DUAL 20-HP MOTORS, USED FOR ROLL HANDLING, [C], DIFFICULTY OF MARKETABILITY UPON REMOVAL |
| 4754 | 1 | PM | BRIDGE CRANE, SHEPPARD-NILES, 5-TON, S/N 67054, APPROX. 30' SPAN, (1) RUNWAY W/FREE-STANDING SUPPORTS, DBL. GIRDER W/TOP RIDING BRIDGE & TROLLEY, 6-WAY PENDANT CONTROL, [OC] *IMPROVEMENTS |
| 4756 | LOT | PM | SHELVING, ADJ., METAL, LOCATED THROUGHOUT ROLL & MOTOR SHOP, INCL. ASSTD. SHOP WELDED STORAGE CABINETS |
| 4759 | 1 | PM | GRINDER, DBL. END, H.D., 12", PED. MTD. |
| 4776 | LOT | PM | OFFICE FURNITURE, LOCATED IN MOTOR & ROLL SHOP REPAIR AREA, INCL. BUT NOT LIMITED TO: ASSTD. DESKS, CHAIRS, TABLES, ETC., [O] |
| 4818 | 5 | PM | FILES, 5-DWR., BLUEPRINT STYLE, [O] |
| 4819 | LOT | PM | LOCKERS, LOCATED THROUGHOUT AREA, NOT OTHERWISE LISTED OR CONSIDERED |
| 4821 | 1 | PM | FACSIMILE MACHINE, OMNIFAX, MDL. G32, [C] |
| 4822 | 1 | PM | BRIDGE CRANE, 25-TON CAP., LOCATED OVER SHEAR LINE AREA, DBL. GIRDER, TOP RIDING BRIDGE & TROLLEY, MFG. BY BROWNING, APPROX. 92' SPAN, COMP. W/APPROX. 4' DIA. LIFTING DEVICE,, [C] *IMPROVEMENTS |
| 4826 | 1 | PM | SHEAR LINE - SEE ATTACHMENT 4 |
| 4880 | 1 | PM | BRIDGE CRANE, DBL. GIRDER, CAB OPERATED, TOP RIDING BRIDGE & TROLLEY, [D], APPROX. 90' SPAN, LOCATED IN BAY W/KICK-OUT TABLES FROM SHEAR LINE, EST. 25-TON CAP., STENCIL #M-15 *IMPROVEMENTS |
| 4884 | 1 | PM | BRIDGE CRANE, CLEVELAND, S/N 16710, 25-TON, W/10-TON AUX. HOIST, LOCATED AT END OF SHEAR LINE, 92' SPAN, CAB OPERATED, DBL. GIRDER, TOP RIDING BRIDGE & TROLLEY, *IMPROVEMENTS |
| 4889 | 1 | PM | BRIDGE CRANE, DBL. GIRDER, TOP RIDING BRIDGE & TROLLEY, CAB CONTROLLED, APPROX. 92' SPAN, (FINAL OR END CRANE IN SHIPPING/PLATE MILL AREA), CLEVELAND, 25-TON, W/10-TON AUX. HOIST, S/N 18705,*IMPROVEMENTS |
| 4896 | 1 | PM | SCALE, ELECTROSCALE, DIGITAL DISPLAY HEAD, MDL. WEIGHT METER 551, INCL. MATRIX PRINTER, APPROX. 8' X 40' PIT MTD. BED, TEST WEIGHT, USED FOR PLATE WEIGHING, (LOCATED IN SHIPPING AREA) |
| 4916 | 1 | PM | SHEAR, MESTA, (SCRAP SHEAR LOCATED ADJACENT TO UNITED CROP SHEAR), 1-1/2" X 24" CAP., INCL. POWER ROLLER TYPE FEED CONVEYOR FROM SHEAR LINE, PIT MTD. SCRAP BIN, ETC., [OC] *W/PLATE MILL LISTED ELSEWHERE |
| 4933 | 1 | PM | BRIDGE CRANE, DBL. GIRDER, TOP RIDING BRIDGE & HOIST, CRANE #45, 50/15-TON, APPROX. 95' SPAN, RIVETED, [OC-], OBSERVED IN OPERATION, W/APPROX. 8' SPREADER BAR, CHAINS *IMPROVEMENTS |
| 4935 | 1 | PM | BRIDGE CRANE, [D-], CLEVELAND, 10-TON, S/N 16175, APPROX. 35-40' SPAN, CONVERTED TO PENDANT CONTROL, DBL. GIRDER, TOP RIDING BRIDGE *IMPROVEMENTS |
| 4945 | 1 | PM | BRIDGE CRANE, DBL. GIRDER, TOP RIDING, APPROX. 15-TON CAP., CAB OPERATED, [D-], RIVETED CONST. (LOCATED NEAR STORAGE AREA FOR CONTINUOUS CASTING EQUIPMENT) *IMPROVEMENTS |
| 5992 | 1 | PM | WELDER, LINCOLN, IDEALARC, R3R-500, S/N U1930005858, 500-AMP, [C+] |

| REF. # | QTY | AREA | DESCRIPTION |
|---|---|---|---|
| 3224 | 1 | PP | AIR COMPRESSOR, SULLAIR, ROTARY SCREW, EST. 150-HP, W/AIR RECEIVING TANK, ETC., SKID MTD., [C-] |
| 3781 | 1 | PP | WATER RECYCLING SYSTEM, COMPLETE W/WATER RESERVOIR, CONCRETE RETAINING WALL, APPROX. 50' W X 100' L X 10', W/STEEL GRATED WALKWAYS, PROCESS PIPING, (4) TURBINE PUMPS, PEERLESS, 5000-GPM EA., INSTALLED, 100% DIFFICYLTY OF MARKETABILITY UPON REMOVAL |
| 3782 | 1 | RO | BRIDGE CRANE, WHITING, 30-TON, DBL. GIRDER, CAB OPER., APPROX. 55' SPAN, TOP-RIDING, W/(1) 30-TON HOIST & (1) 10-TON HOIST, ETC., [C] *IMPROVEMENTS W/ ROLL SHOP |
| 1016 | 7 | RR | RAILCARS, APPROX. 50', FLATBED STYLE, UNDERCARRIAGE P, USED FOR SCRAP ONLY, [D] |
| 3696 | 1 | RR | LOCOMOTIVE CRANE, UNIT #289, SELF-PROPELLED |
| 3697 | 1 | RR | LOCOMOTIVE CRANE, UNIT #287, SELF-PROPELLED |
| 1017 | 1 | VE | 1992 GMC TOPKICK 15' SINGLE AXLE - FLATBED TRUCK VIN 1GDJ6H1PINJ507077 GSS#143 |
| 6215 | 1 | VE | TRUCK, CHEVROLET, 1992, VIN 1GCFC24K7NZ21031 |
| 1007 | 1 | YD | BRIDGE CRANE #2 10 TON MORGAN 69'3" SPAN - OUTSIDE OF LOCO REPAIR |
| 1013 | 1 | YD | BRIDGE CRANE #29 MIWAUKEE 7.5 TON 27' SPAN - TRACTOR SHOP |
| 1018 | LOT | YD | UTILITY DISTRIBUTION FACILITIES AND EQUIPMENT (POWER, WATER, GAS, ETC.) - INCLUDING BUT NOT LIMITED TO, WILLS CREEK, COOSA RIVER PUMP STATION, HICKORY STREET SUBSTATION, ROD MILL SUBSTATION, COURTYARD SUBSTATION, INDUSTRIAL RELATIONS SUBSTATION, POWER PLANT OUTSIDE SUBSTATION - RELATED OVERHEAD/UNDERGROUND LINES/PIPING AND OTHER ASSOCIATED EQUIPMENT NECESARY FOR MILL OPERATIONS * W/ MILL EQUIPMENT |
| 4333 | 1 | YD | LUBRICANT STORAGE FACILITY, WITHIN CONCRETE CONTAINMENT WALL, OVERALL APPROX. 40' W X 100' L, COMPLETE W/(2) CARBON STEEL STORAGE TANKS, ELEVATED ABOVE GROUND, W/STRUCTURAL STEEL FRAMEWORK, EA. APPROX. 20,000-GAL. CAP., WALKWAYS, STAIRWAYS, HANDRAILS, ETC., (1) WELDED CARBON STEEL STORAGE TANK, W/SPRAYED EXTERIOR INSULATION, (2) PUMP SYSTEMS, ELEVATED ABOVE GROUND ON STRUCTURAL STEEL FRAMEWORK, LADDER, TOP MTD. WALKWAY, ETC., HIGH DIFFICULTY OF MARKETABILITY UPON REMOVAL, [C] |
| 4638 | 1 | YD | TRUCK SCALE, APPROX. 12' W X 60' L, ELECTROSCALE ELECTRONIC SCALE HEADS, DIGITAL READOUTS, UNABLE TO CLOSELY INSPECT DUE TO SCALE HOUSE BEING LOCKED, HIGH DIFFICULTY OF REMOVAL MARKETABILITY, [O] |
| 4932 | 1 | YD | CONVEYOR SECTION, INCLINED, CONTINUOUS PLATE TYPE, APPROX. 24" X 40', (FOR SCRAP FROM SHEAR LINE), LOADS INTO RAILCAR |
| 5067 | LOT | YD | CONVEYORS, CONTINUOUS PLATE TYPE, APPROX. 150-200', (CARRIES HOT ROLLS FROM END OF HOT STRIP MILL LINE TO LOADING/STAGING AREA, INCL. AUTO. STOPS, SHED TYPE PROTECTIVE STRUCTURE, PIT MTD., 65% DIFFICULTY OF MARKETABILITY UPON REMOVAL |
| 5234 | 1 | YD | CONVEYOR SYSTEM, VISIBLE SECTION APPROX. 18" INCLINED BELT X 40' OVERALL LENGTH, CONSIDERED TO INCL. PIT MTD. SECTION, FEEDS SCRAP OR SLAG FROM PLATE MILL PRE-HEAT FURNACE, NO VALUE CONSIDERATION FORPIT MTD. SECTION UNDER REMOVAL CONCEPT, UNDERGROUND EST. APPROX. 75' |
| 8073 | 3 | YD | AERATORS, LOCATED IN LAGOON, TYPE UNKNOWN, H.D., FLOATING, [C] |

NORMAN,WOOD,KENDRICK&T   ID:205-251-5479   SEP 30'02   16:11 No.007 P.??
SEP 30 '02 05:01PM

| REF. # | QTY | AREA | DESCRIPTION |
|---|---|---|---|
| 6074 | 1 | YD | PUMP FACILITY, LOCATED ON LAGOON, INCL. CORRUGATED METAL PUMP HOUSE, APPROX. 10' X 14' X 10', ASSUMED INCL. INTERIOR PUMP, W/DRIVE, ETC., [C] *IMPROVEMENTS |
| 6075 | 1 | YD | STORAGE TANK, APPEARANCE FOR ALL STORAGE, LOCATED NEAR LAGOON, INDICATED TANK ENV11, CARBON STEEL, APPROX. 7500-GAL., INCL. CONTAINMENT WALL, ACCESS LADDER, PIPING, ETC., [C-] |
| 6076 | 1 | YD | SKIMMER SYSTEM, INSTALLED IN LAGOON, W/DRIVE, PUMP, ETC., INCL. PLATFORM, ELECTRICS |
| 6077 | 1 | YD | STORAGE TANK, USED OIL, LOCATED NEAR LAGOON, APPROX. 15000-GAL., CARBON STEEL, HORIZ., INCL. PUMP, CONTAINMENT WALL, ACCESS LADDER, ETC., ASSTD. AUXILIARY HOUSES, PUMP HOUSE, ETC. |
| 6266 | 1 | YD | GENERATOR, KATO, PORT., 1979, S/N 79287 |
| 6267 | 1 | YD | GENERATOR, MFG. NOT VISIBLE, DETROIT 8V71 DIESEL, TRAILER MTD. |

| REF. # | QTY | AREA | DESCRIPTION |
|---|---|---|---|
| 4492 | 1 | CS | STENCIL MACHINE, DIAGRAPH BRALEY, 1", [C] |
| 5403 | 1 | CS | BRIDGE CRANE, P&H, LOCATED IN COIL STORAGE AREA, 15-TON, DBL. GIRDER, TOP RIDING BRIDGE & HOIST, CAB OPERATED, RIVETED CONST., CRANE #55, 55' SPAN, [C] *IMPROVEMENTS |
| 5412 | 1 | CS | BRIDGE CRANE, RIVETED, DBL. GIRDER, 15-TON CAP., CAB OPERATED, CRANE #56, 90' SPAN, S/N 9157, INSTALLED 1930, MFD. BY P&H, [O] *IMPROVEMENTS |
| 5413 | 1 | CS | SCALE, LOCATED IN COIL SHIPPING AREA, CONVERTED FROM FAIRBANKS MORSE MECHANICAL HEAD TO ELECTROSCALE DIGITAL HEAD, 50,000-LB. CAP., INCL. MATRIX II PRINTER, APPROX. 6' X 12' PIT MTD. BED |
| 5416 | 1 | CS | BRIDGE CRANE, 40-TON, DBL. GIRDER, TOP RIDING BRIDGE & HOIST, CAB OPERATED, MFD. BY BROWNING, CO. #123, S/N 83-206, 106' SPAN, ORIGINALLY MFD. BY P&H, INSTALLED 1964 *IMPROVEMENTS |
| 5525 | 1 | CS | HANDLING DEVICE, FOR ROLL HANDLING |
| 5526 | 1 | CS | BRIDGE CRANE, LOCATED IN COIL STORAGE BAY BETWEEN ANNEALING & 4-HIGH TEMPER MILL, CRANE #51, 25/16 TON, 60' SPAN, MFD. BY P&H, DBL. GIRDER, TOP RIDING BRIDGE & HOIST, RIVETED [OD] *IMPROVEMENTS |
| 5528 | 1 | CS | BRIDGE CRANE, UNIT #97, LOCATED IN 4-HIGH TEMPER MILL AREA, 40-15 TON, 75' SPAN, CLEVELAND, DBL. GIRDER, CAB OPER., [OC-] *IMPROVEMENTS |
| 4153 | 4 | ME | LADLES, POURING, FROM BOTTLE CAR INTO BOF, (ALSO KNOWN AS CHARGING LADLES), APPROX. 60-TON CAP. |
| 4428 | 1 | ME | SEE ATTACHMENT 1 |
| 4465 | 1 | ME | BRIDGE CRANE, NOT IN USE AT INSP., DBL. GIRDER, APPROX. 50' SPAN, LABELED 7-1/2 - 18-1/2-TON, INDICATED OUT OF OPERATION FOR EXTENDED PERIOD, (TONNAGE QUESTIONABLE), W/HORIZ. ATTACH. INDICATED FOR FORMER USE OF TAPPING FURNACES, [E], AS IS *IMPROVEMENTS |
| 4468 | 1 | ME | SCALE, LOCATED ON MEZZANINE AREA, USED IN STORAGE, ELECTROSCALE WEIGHT METER, MDL. M7-525, 19000-LB. CAP., W/APPROX. 4' X 6' PIT MTD. BED |

| | | | |
|---|---|---|---|
| 4472 | 1 | ME | SCALE, LOCATED ON 2ND FLOOR, APPROX. 6' X 6' ABOVE GROUND PLATFORM, MECHANICAL SCALE HEAD, [D], CONVERTED TO USE W/REMOTE DIGITAL HEAD |
| 4483 | 3 | ME | SCRAP LADLES, #9, #5 & #8, 1250-CU. FT. CAP., W/MECHANICAL TOGGLE, SIDE MTD. PINS FOR CRANE HANDLING, STEEL, [C-] |
| 4494 | 1 | ME | BRIDGE CRANE, CONSIDERED 20-TON CAP., APPROX. 60' SPAN, DBL. GIRDER, COMP. W/MAGNET, USED FOR LOADING SCRAP INTO SCRAP BUCKETS, CAB CONTROL, [OD] *IMPROVEMENTS |
| 4496 | 1 | ME | SCRAP LADLE, #7, 1250-CU. FT. CAP., W/MECHANICAL TOGGLE, SIDE MTD. PINS FOR CRANE HANDLING, STEEL, [C-] |
| 4524 | 1 | ME | SCALE, 400-TON, 4-SECTION, LOCATED AT CHARGING FLOOR |
| 4527 | 1 | ME | SCRAP CHARGING SYSTEM, FOR PREHEATING SCRAP, NOT OTHERWISE LISTED OR CONSIDERED |
| 5882 | LOT | ME | CONVEYORS, (LOCATED IN YARD ON BACK SIDE OF BOF), INCL. CONVEYOR HOUSE, APPROX. 350-LF., SUPPORTS, ETC. |
| 5950 | 2 | ME | PRECIPITATORS, INSTALLED NEW 1993, ENVIRONMENTAL ELEMENTS CORPORATION, EA. W/(4) HOT DUST HOPPERS, V-BOTTOM, CORRUGATED METAL EXTERIOR, INSTALLED & ELEVATED ON H.D. STRUCTURAL STEEL MEZZANINE, W/ALLFRAMEWORK, CATWALKS, STAIRWAYS, HANDRAILS, ETC., BOTTOM SCREW AUGER, ELECTRIC MECHANICAL DISCHARGE, W/DUCTING, CONTROL HOUSE, CONTROL HOUSE MDL. 36WA6-C09C, S/N 060C920715394-1, AIR CONDITIONED, W/ENVIRONMENTAL ELEMENTS CORPORATION CONTROL PANEL, W/(8) DIGICON OPTIPULSE CONTROLLER CABINETS, EA. W/AMP & VOLTMETERS, KILOVOLT METERS, MILLIAMP METERS, DIGITAL READOUT, LIMIT CONTROL & LIGHT INDICATORS, MEASUREMENT CONTROLS CORPORATION TYPE RM-41 VISIBLE EMISSION MONITORING SYSTEM, LEAR-SIEGLER MDL. 811 CONTROL UNIT, W/YOKAGAWA CONTINUOUS CHART RECORDER PRINTOUT, FOXBORO MONITORING CABINET, W/DIGITAL INDICATORS, ALLEN-BRADLEY CENTERLINE MOTOR CONTROL CENTER, W/ALL SAFETY SWITCHES, BREAKERS, ETC., ACROS 486SX/25 COMPUTER, W/COLOR MONITOR, KEYBOARD, NEC PINWRITER PRINTER, INCL. HIGH VOLTAGE LIQUID FILLED TRANSFORMER ON GROUND, HIGH DIFFICULTY OF MARKETABILITY UPON REMOVAL, [C] |
| 5952 | 1 | ME | BAGHOUSE, FOR BASIC OXYGEN FURNACES, CANTECH ENVIRONMENTAL SYSTEM, 150,000-ACFM, PULSE TYPE BAG FILTERS, 8-COMPARTMENT, 250-BAG PER COMPARTMENT, ELEVATED ON STRUCTURAL FRAME, W/CONCRETE FOOTINGS, INCL. ALL WALKWAYS, HANDRAILS, STAIRWAYS, ETC., W/CONTROL ROOM, CONCRETE BLOCK ENCLOSED, W/BENTLY NEVADA 3300 SYSTEM VIBRATION MONITORS & SYSTEM MONITORS, MULTILIN MOTOR MANAGEMENT RELAY, GENERAL ELECTRICLIVIDAMP CONTROL CENTER, 300-KVA TRANSFORMER, 480-VOLT, MILLTRONICS MOTION FAILURE ALARMS, FOR SCREW CONVEYORS, ASSTD. ALLEN-BRADLEY MOTOR CONTROL CENTER BREAKER PANELS, 920-HP GENERAL ELECTRIC MOTORDRIVE, 800-HP, INCL. ALL DUCTING, EXHAUST, PIPING, ETC.; 25-HP, SULLAIR AIR DRYER, TYPE SAR-125, S/N 003-D6735, PNEUVEYOR SYSTEMS LTD. VACUUM BLOWER, W/UNIVERSAL SILENCER, ETC., HIGH DIFFICULTY OF MARKETABILITY UPON REMOVAL, [C] |
| 6078 | 2 | ME | LADLE PREHEATERS, FOR USE W/150-TON LADLES, WELDED I-BEAM FRAMEWORK, CONCRETE PAD BASE, HYD. ACTUATED LID, REFRACTORY LINED, GAS FIRED, W/BLOWERS, CONTROLS, PROCESS PIPING, ETC., HIGH DIFFICULTY OF MARKETABILITY UPON REMOVAL, [C-] |

**ATTACHMENT 1**

## HOT STRIP MILL – REF. # 5269

HOT STRIP MILL, 54", INCL. BUT NOT LIMITED TO: (2) RUST SLAB FURNACES, PUSHER
TYPE, ORIGINALLY RATED @ 100-TON/HR. IN 1969, EA. APPROX. 20' W HEARTH X 80' L
NATURAL GAS COKE OR FUEL-OIL FIRED, (2) TREADWELL PUSHERS, ((2) FOR EA.
FURNACE); CONTROL SYSTEM BY ESI OF CHATTANOOGA, TN., CONTROLS
INSTALLED 1989, PUSHER & OVEN CONTROLS, INCL. ASSTD. JOYSTICKS, TEMP.
GAUGES, ETC.; FURNACE INCL. ALL BLOWERS, (INDICATED W/300-HP BLOWER
MOTORS), RELATED DUCT, ETC.; SPECIFIC FURNACE CONTROLS BY COMAC,
(APPLIED PROCESS CONTROLS), PLATE INDICATES INSTALLED 1989, INCL.
INDEPENDENT CONTROLS FOR EA. FURNACE, COMP. W/PRESSURE INDICATORS, TOP
& BOTTOM HEAT ZONE INDICATORS, SOAK ZONE, ASSTD. INDICATOR LIGHTS,
COLOR MONITORS, ALARM SYSTEMS, ETC., FURTHER INCL. HEWLETT-PACKARD
MDL. 7475A PLOTTER, DIGITAL MDL. LA75 PRINTER, ((1) FOR EA. FURNACE), (NOTE:
ALL COMPONENTS REMOVED FROM OLD CONTROL PANEL); EXIT END OF
FURNACES INCL. APPROX. 15' W H.D. BUMPERS; DE-SCALING BOOTH COMP. W/ASSTD.
CHAINS, ETC., SIDE GUIDES FOR DIVERTING SLAB THRU DE-SCALE SYSTEM; MESTA
VERT. EDGER, 44" X 18" X 60" X 60", COMP. W/(2) 275-HP DRIVE MOTORS, (QTY. OF (2)
EDGERS W/(1) PER SIDE); UNITED SCALE BREAKER W/800-HP MOTOR DRIVE, 28" X 56"
CAP., SGL. ROLL; CONTINENTAL KICK-OFF STAND, W/APPROX. 8' L 4-BAR ARMS,
MECHANICAL ACTION, W/(2) 5000-HP DC MOTOR DRIVES, W/MG SETS, . ETC.,
(CONTROL FROM PULPIT); RUN-OUT TABLE FROM SCALE BREAKER APPROX. 43' X 8'
W; ROUGHING MILL, 4-HIGH, SGL. STAND, 39" X 54" X 58", MFD. BY MESTA,
ROUGHING MILL CONTROLS INCL. ASSTD. FORWARD/REVERSE JOYSTICK TYPE
CONVEYOR CONTROLS, WESTINGHOUSE SCREW-DOWOUT TABLES FROM
ROUGHING MILL TO COIL BOX, APPROX. 50' X 8' W; MESTA COIL BOX, (INSTALLED
1988), INCL. ASSTD. SILTRON DIGITAL DRIVE CONTROLS BY GENERAL ELECTRIC,
GENERAL ELECTRIC WORKMASTER COMPUTER TERMINAL, GENERAL ELECTRIC
TYPE 8000-LINE SWITCHGEAR, VARIOUS CIRCUIT BOARDS, DEDICATED AIR
CONDITIONING UNITS, ETC., CONTROLS FOR COIL BOX BY GENERAL ELECTRIC,
COMP. W/PROGRAMMABLE INTERFACE TERMINAL,ASSTD. MONITORS, (1) G. E.
FANUC CONTROL TERMINAL, MISC. JOYSTICKS, GAUGES FOR #1 & #2 CRADLE
ROLLS, TOP & BOTTOM BENDING ROLLS, MESTA COIL BOX, (INSTALLED 1988), COIL
BOX DESIGNED W/STAGING TABLE FOR ROLLED COIL WHILE 2ND COIL BEING
ROLLED, INCL. ALL RELATED ROLLS FOR COIL OPERATION, DESIGNED TO COIL
HOT ROLL, ALSO COMP. W/HYD. MANDREL FOR UNLOADING COIL ROLL, OVERARM
PEELER, ROLLS HYDRAULICALLYPOSITIONED, SYSTEM INCL. ALL NECESSARY
DRIVES, REDUCERS, HYD. PUMPS & RESERVOIRS, ETC.; WEAN UNITED FINISHING
MILLS, (6-STAND), EA. 4-HIGH, W/DAVY/KVAERNER METALS HAGC (HYD. AUTO
GAUGE CONTROLS), 1997, INTERFACED TRACKING SYSTEM, CONTROL PULPIT,
COMP. W/ALL DRIVES, CONTROLS, ETC.; CONTROLS FOR FINISHING MILL INCL.
PROGRAMMABLE SELSYN INDICATORS FOREA. STAND OPERATION, INCL. SIDE
GUARD, SCREW-DOWN, ALSO INCL. ASSTD. SPEED INDICATORS, LOOPER
INDICATORS, COMP. W/MONITOR FOR SHOWING MILL FUNNEL OPERATION, X-RAY
SYSTEM FOR CHECKING PRODUCT AS IT MOVES FROM FINISHING MILL, CONTROLS
INCL. ALL NECESSARY ELECTRICS, SWITCHGEAR, CHART RECORDERS, COMPUTER
PRINTERS, ETC.; RUN-OUT TABLE COMP. W/WATER SPRAY, APPROX. 150',
W/ADDITIONAL 150' OF DRY RUN-OUT TABLE, RATED 49-3/4-MAX. WIDTH OF COIL,
ALL RUN-OUT CONVEYORS INCL. SIDE GUARDS, FINAL PINCH ROLL; UNITED

COILER, W/MANDREL CLAMPS, COIL CRADLE BENDER; PRODUCT TRANSFERRED
ONTO CONT. PLATE TYPE CONVEYOR, APPROX. 36" W, W/APPROX. 8" W PLATES;
ALSO INCL. SCALE W/AUTO. SCALE TABLE, DIGITAL SCALE HEAD, W/PRINTER,
SCALE EST. APPROX. 15,000-LB. MAX. CAP. BASED ON SIZE OF ROLLS BEING
PRODUCED; CONTROL PULPIT FOR PINCH ROLL CRADLE & EXIT CONVEYOR, INCL.
WESTINGHOUSE CONTROLS, W/CONTROLS FOR PINCH ROLLS, WRAPPER ROLL,
STRIPPER CAR, COIL CAR, UPENDER, ETC., INCL. ASSTD. FMP & AMP GAUGES FOR
SPEED INDICATION; LINE CAPACITIES RANGE FROM 49-3/4" W DOWN TO 22" W,
(FINISHED PRODUCT WIDTH), W/1/4" DOWN TO .056" THICKNESS CAP., APPROX. 1%
OF ORIGINAL SLAB WEIGHT IS LOST THROUGH PROCESS, ROLLS ARE MANUALLY
BANDED AT SCALE STATION, VALUE CONSIDERATION INCL. ALL ELECTRIC
EQUIPMENT, MOTORS, ASSOCIATED SPARES (ONSITE & AT OUTSIDE SHOPS),ETC.
NECESSARY FOR MILL OPERATION, 55% DIFFICULTY OF MARKETABILITY UPON
REMOVAL

## ATTACHMENT 2  METALLURGICAL ARC FURNACE SYSTEM – REF. #5948

METALLURGICAL ARC FURNACE SYSTEM, DEMAG, INCL., BUT NOT LIMITED TO:
ELECTRIC ARC MELT FURNACE HOOD, SETUP TO HANDLE 150-TON PLUS LADLES,
WATER COOLED, UTILIZING APPROX. 18" DIA. ELECTRODES, W/HYD. ELECTRODE
RAISING/LOWERING SYSTEM, JACKETED LINES, HEAVY STRUCTURAL FRAME, H.D.
STRUCTURAL STEEL TRACK MTD. LADLE CART, FUME EXHAUST DUCTING,
ELEVATED STRUCTURAL STEEL PLATFORM, W/STAIRWAYS, HANDRAILS, ETC.,
ADDITIVE SYSTEMS, INCL. HOPPERS, FEEDERS, SYNTRON VIBRATORY
OSCILLATORS, ETC., LADLE CLAMP SYSTEM, W/REMOTE CONTROL, WATER
COOLING SYSTEM, INCL. PIPING, PUMPS, ETC., TRANSFORMER ROOM, CONCRETE
BLOCK ENCLOSED, CONTROL ROOM, INCL. SPECTRO ANALYTICAL INSTRUMENTS
SPECTRO LAB F CONTROL CONSOLE, W/MONITOR, KEYBOARD, VARIOUS
TELEVIDEO & LINK MONITORS, W/KEYBOARD, MAIN CONTROL PANEL, W/DEMAG
VOLTMETERS, DIGITAL READOUT, PIT/CENTER/FLOOR CONTROLS, JOYSTICKS FOR
FURNACE HOOD CONTROLS, HYD., MASTER MENU CONTROL, TYPE PANELMATE
SERIES, EATON IDT, TRANSFORMER MFG. BY MAGNETEK, IN-DOOR FURNACE
TRANSFORMER, 28,000-KVA FOR (45) MINUTES RATED LOADING CYCLE,
CONTINUOUS RATING 28,000-KVA @ 55-DEG. C RISE, CONTINUOUS RATING 31,360-KVA
@ 65-DEG. C RISE, TYPE OFWN, 3-PHASE, 60-HZ, 13,800-VOLT, FRESH AIR BLOWER
SYSTEM FOR TRANSFORMER ROOM, INCL. DUCTING, ETC., ALSO INCL. BAGHOUSE
LISTED ELSEWHERE, ASSOCIATED SPARES (ONSITE & AT OUTSIDE SHOPS),
INDICATED NEW APPROX. 1991-1992, [C]

## ATTACHMENT 3 PLATE MILL –REF. #4690

PLATE MILL, INCL. BUT NOT LIMITED TO: AMSLER MORTON PREHEAT PUSH
FURNACE, 160-TON/HR. CARBON STEEL CAP., 23' WIDE X 90' L HEARTH, (30)
ZONE BURNERS, (11) SCREENING BURNERS, SLABS EXIT FURNACE @ APPROX.
2375-DEG. F.; FURNACE ACCESS. INCL. ALL RELATEDBLOWERS, PIPING,
PLATFORMS, BURNER LINES, ETC.; CONTROL ROOM, W/MESTER PUSHERS,
COMAC, NEW CONTROLS, INSTALLED 1995, APPLIED PROCESS CONTROLS,

CURRENTLY UPGRADING TO LEVEL II TOTAL TRACKING SYSTEM, COMP.
W/DIGITAL DISPLAYS FOR SOAK ZONE, TOP & BOTTOM INTERMEDIATE
ZONE, TOP & BOTTOM PRIMARY ZONE, COLOR MONITOR, DEDICATED AIR
CONDITIONING UNIT, ETC.;FURNACE ALSO INCL. SLAB UNPILER, (LOCATED
AT EXIT END); SLAB CONTINUES TO ROUGHING MILL ON APPROX. 60' X 8'-10'
POWER ROLLER CONVEYOR; ROUGHING MILL (USED FOR WIDTH SIZING), NO
MFG. VISIBLE, 48" W X134" L CAP., 2-HIGH, FURTHER INCL. QUENCH SYSTEM,
4000-HP MOTOR DRIVE, ALL RELATED MOTOR DRIVES FOR ROLLS, FEED
ROLLS, ETC., (2) 2000-METRIC TON PRESS DUCTORS; CONVEYOR TABLES FOR
TRANSFER TO PLATE MILL INCL. APPROX. 22' ROUGHING MILL BACK TABLE,
37' INTERMEDIATE TABLE, 22' PLATE MILL FRONT TABLE, ALL EST. APPROX.
10' WIDTH & POWER ROLLER TYPE; 4-HIGH PLATE MILL, (REVERSING), 39" X
59" X 134" CAP., COMP. W/ALL NECESSARY DRIVES, ROLLS, (2) 2500-METRIC
TON PRESS DUCTORS, 5000-HP MAIN DRIVE, QUENCH SYSTEM, ETC.;
CONTROL PULPIT FOR LINE OPERATION, INCL. INDEPENDENT CONTROL
SYSTEMS FOR ROUGHING MILL & PLATE MILL, EA. W/JOYSTICK TYPE
CONTROLS, OPERATOR'S SEAT, ASSTD. GAUGES & INDICATORS, EA.
OPERATOR STATION INCL. MONITORS CONSIDERED W/RELATED CAMERAS,
PANALARM ALARM SYSTEM BY GENERAL ELECTRIC,37' MILL RUNOUT
TABLE, (2) 36' INTERMEDIATE TABLES, (2) LEVELER APPROACH TABLES, ALL
APPROX. 10'-12' L; PLATE LEVELER 134" WIDTH CAP., WATER QUENCH, COMP.
W/(5) WORK ROLLS, (6) UPPER ROLLS, ALL DRIVES, CONTROLS, ETC.;
COOLING BED, (AIR COOLED), 3-SECTION, W/CHAIN TYPE TRANSFER
KICKERS, DESIGNED TO HANDLE 4" X 126" W X 70' L PLATES SPACED @ 15',
CARRIES PLATE TO INSP. STATION, TABLES APPROX. 70' &EXTEND TO
APPROX. 150' L; REMAINDER OF PLATE LINE EQUIPMENT (SHEARS,
CONVEYOR, ETC.) LISTED IN SEPARATE ENTRY; COMP. LINE OBSERVED IN
OPERATION AT INSP., INCL. ALL ITEMS NOT SPECIFICALLY LISTED &
NECESSARY FOR OPERATION, SUCH AS CONTROLS, DRIVES, ROLL ACCESS,
ASSOCIATED SPARES (ONSITE & AT OUTSIDE SHOPS), ETC., 55% DIFFICULTY
OF MARKETABILITY UPON REMOVAL, [OC]


## ATTACHMENT 4   SHEAR LINE -REF. # 4826

SHEAR LINE, (CONTINUATION OF PLATE MILL), INCL. BUT NOT LIMITED TO:
MARKING TABLES, (1) APPROX. 26' L, (1) APPROX. 32' L, EA. W/132" L
W/CASTERS, APPROX. 60' OF APPROACH CONVEYOR, ALSO APPROX. 132"
L;PNEU. PLATE ALIGNER; CONTINENTAL SHEAR (CROP SHEAR), 1" X 156"
CAP., COMP. W/MOTOR DRIVES, ETC., MECHANICAL OPERATION, INCL. BACK
GAUGE STYLE LENGTH CONTROL; RUN-OUT TABLES FROM CONTINENTAL
SHEAR APPROX. 85' OVERALL L; COOLING OR STAGING TABLES, SLOTTED
SURFACE, APPROX. 35' W X 65' L; (3) SHEAR ALIGNMENT DEVICES LOCATED
PREVIOUS TO MESTA SIDE TRIMMERS; MESTA 1" X 120" ROTARY SIDE
TRIMMER (DBL.),COMP. W/SCRAP CHOPPERS, ALL NECESSARY DRIVES,
HYDRAULICS, ETC.; APPROX. 75' OF RUN-OUT TABLES FROM SIDE TRIMMERS;
APPROX. 50' SHEAR APPROACH TABLE; CONTINENTAL SHEAR (END-CUT
SHEAR), 1" X 156" CAP., COMP. W/NECESSARY DRIVES, CONTROLS, BACK

GAUGE TYPE LENGTH CONTROL DEVICE, ETC.; FINAL RUN-OUT TABLE INCL.
ROLLER TYPE CONVEYORS W/CROSS MTD. CHAIN KICKERS, PRODUCT CAN
BE DIVERTED TO STACKING TABLE ORCONTINUE THRU FINAL PINCH ROLL
& INTO STACKING TABLE FOR LONG PIECES, (APPROX. 80' PLUS); MESTA
GAUGING DEVICE MTD. ABOVE FINAL RUN-OUT TABLE; SGL. PINCH ROLL
LOCATED AFTER MESTA GAUGING DEVICE; 8-STRAND CHAIN TYPE KICK-
OUT TABLE, COMP. W/(7) INTERMITTENTLY 4" ROLLER CONVEYOR STANDS,
(SET OF (2) LOCATED ON EITHER SIDE OF LINE; CONSIDERED AS COMP.
SYSTEM, INCL. ALL NECESSARY EQUIPMENT FOR OPERATION, DRIVES,
CONTROLS, AUX. ITEMS, ASSOCIATED SPARES (ONSITE & AT OUTSIDE SHOPS),
ETC., [C], MODERATE DIFFICULTY OF MARKETABILITY UPON REMOVAL
*W/PLATE MILL LISTED ELSEWHERE.


## ATTACHMENT 5- INVENTORY

BY PRODUCTS OF MANUFACTURING INCLUDING BUT NOT LIMITED TO  KISH
AND MISCELLANEOUS OTHER MATERIALS AND ASSORTED SCRAP.


## ATTACHMENT 6-BOF SYSTEM   REF #4428

BOF SYSTEM, INCL. BUT NOT LIMITED TO: (2) VESSELS, EA. RATED 150-TON
CAP., 22' OD X APPROX. 32' H, TRUNNION MTD., COMP. W/(4) MOTOR DRIVES
FOR ROTATING, BRICK LINED; CONTROL PULPIT, INCL. CONTROLS FORFLUX,
HOT METAL, SCRAP ADDITIVES; ALSO INCL. VESSEL #1 & #2 CONTROLS,
W/JOYSTICK TYPE POSITIONER; ASSTD. MONITORS, CONSIDERED COMP.
W/ALL VIDEO RELATED EQUIPMENT, CAMERAS, ETC., CONTROL PANEL
W/MFG. PLATES INDICATING KOPPERS & CUTLER-HAMMER; VESSELS FED BY
CRANE LIFTED LADLES AND/OR SCRAP HOPPERS, APPROX. 35' FLOOR
HEIGHT FOR FEED; ALSO INCL. ASSTD. RAW MATERIAL HANDLING
EQUIPMENT LOCATED ABOVE VESSELS, INCL. FLUX STORAGE BINS, DBL.
COMPARTMENT BINS @ 1300-CU. FT. CAP. EA., (8) 2100-CU. FT. FLUX BINS,
WEIGH HOPPERS, COKE STORAGE BIN & COKE STOVE, ETC.; SYSTEM
CONTROLLED BY COMPUTER SYSTEM LABELED CLASSIC BY MODCOM,
COMP. W/CPU, DUAL 8" FLOPPY DRIVES, TAPE DRIVES, (5) MODAC-III UNITS,
TELEVIDEO MONITORS, DIGITAL LA-50 PRINTER, PRINTRONIX MDL. P300
PRINTER, ADDS TERMINALS, (INCL. ASSTD. ADDSTERMINALS & PRINTERS
LOCATED IN METALLURGICAL BLDG.), COMPUTER ROOM INCL. (1) LIEBERT
POWER CONDITIONER, (2) COMFORT-AIRE AIR CONDITIONERS; ADDITIONAL
EQUIPMENT INCL. GAS CLEANING SYSTEM FOR FURNACES, EA. W/DBL.
COMPARTMENT PRECIPITATORS RATED AT 357,000-CFM, INDUCED DRAFT
FANS; DUST COLLECTION SYSTEM, W/PRECIPITATOR-HOPPER FEEDERS,
ROTARY FEEDERS, SCREW CONVEYOR FOR DUST COLLECTION TRANSFER,
BUCKET ELEVATOR & 120-TON CAP. STORAGE BIN; SMOKE SYSTEM INCL.
HOOD, DUST COLLECTOR, EXHAUST FAN; WATERRECIRCULATION SYSTEM
INCL. 2-FAN COOLING TOWER, W/ALL RELATED PUMPS, LANCE COOLING

NORMAN,WOOD,KENDRICK&T   ID:205-251-5479        SEP 30'02   16:16 No.007 P.22
                                                           SEP 30 '02  05:01PM

EQUIPMENT W/BOOSTER PUMPS, ETC., ALSO W/RELATED PUMPS & PIPING
FOR SLUDGE REMOVAL, DIRTY WATER RECIRCULATION, ETC.; BOTH
VESSELS OBSERVED IN OBSERVATION AT INSP.,

## ATTACHMENT 7-WATER TREATMENT SYSTEM - REF.# 5961

WATER TREATMENT SYSTEM, INCL., BUT NOT LIMITED TO: SIZE APPROX. 75'
X 85' X 15', CONCRETE, INCL. ALL ACCESS LADDERS, STAIRWAYS, HANDRAILS,
ETC., CONCRETE TOP, W/AERATORS, EXPLOSION PROOF LIGHTING,
PASSOVERS, INSULATED PIPING, ETC., (3) SPENCER AERATOR PUMPS, MDL.
RBL60, 40-HP EA., W/PIPING, (2) VERTICAL STORAGE TANKS, INSULATED &
HEATED, ASSUMED CARBON STEEL, APPROX. 10,000-GAL., FOR ENV2
DISODIUMPHOSPHATE & SULFURIC ACID STORAGE, (1) STORAGE TANK,
CARBON STEEL, APPROX. 6000-GAL., SODIUM HYDROXIDE, W/PIPING,
ENCLOSED IN CONCRETE CONTAINMENT WALL, APPROX. 12" THICK, 40' W X
40' L X 3' H, LIQUID FILLED TRANSFORMER, (8) FEEDER PUMPS,
W/AUTOMATED VALVES, MIXER TANK, FIBERGLASS, APPROX. 300-GAL.,
W/AGITATOR, MOTOR CONTROL CENTER, WESTINGHOUSE, SERIES 2100,
REVERE CONTROL SYSTEM, W/ALARM MONITOR PANEL, LIGHT INDICATORS,
(2) MICON DIGITAL PH CONTW/CASTERS, SIGNET FLOW CONTROLLER,
DIGITAL, PENNY GILES TELETREND FLOW MONITOR, AZONIX SCANNER PLUS
CHANNEL/DATA VALUE/UNIT READOUTS, (1) STORAGE TANK, CARBON STEEL,
INSULATED, APPROX. 8000-GAL., W/WORTHINGTON CENTRIFUGAL PUMP,
STOCKHAM H.D. GATE BELTS, 30-HP UNIMOUNT DRIVE, SIEMENS ELECTRIC
SAFETY SWITCH, SECONDARY PUMP, WORTHINGTON, 30-HP, (6) HEAT
EXCHANGERS, AMERICAN HEAT RECLAIMING COMPANY, L-H, W/ALL PIPING,
VALVES, ETC., FEEDER TANK, HORIZ., CARBON STEEL, APPROX. 20,000-GAL.,
CONCRETE FOOTINGS, (2) CENTRIFUGAL PUMPS, WORTHINGTON, EA.
W/SIEMENS 3-HP MOTOR, INCL. ALL ELECTRICS, SWITCHGEAR, ETC., HEAT
EXCHANGERS & TANKS UNITIZED IN CONTAINMENT WALL AREA, APPROX.
10" THICK, APPROX. 85' L X 25' W X 2' H CONCRETE FLOORING, (1)
AUTOMATIC SELF-CLEANING STRAINER, KINNEY ENGINEERS, PIPING,
ELECTRICS, ETC.

# END OF DESCRIPTION

ZØ5 45B ØØ35 TO 141Z5ØJØØ1Ø7Ø111 1.ØJ
DEC 03 '02 11:57AM

## EXHIBIT "B"
### Purchaser's Itemization of Excluded Items from Sale

1. With reference to the property identified in "ATTACHMENT 5 - INVENTORY," Purchaser excludes:

    A. All miscellaneous other materials.

    B. All by-products of production other than kish and 420,000 cubic yards of slag which are located on the Excluded Real Property as is described on Exhibit B to the deed from Seller to Purchaser of even date herewith, together with a reasonable period of time to remove such items.

2. Item Reference #6074 from "Schedule One to Trustee's Bill of Sale Spreadsheet," being pump facility, located on lagoon, incl. corrugated metal pump house, approx 10' X 14' X 10', assumed incl. interior pump w/drive, etc., [C] Improvements.

3. Item Reference #6075 from "Schedule One to Trustee's Bill of Sale Spreadsheet," being storage tank, appearance for all storage, located near lagoon, indicated tank env11, carbon steel, approx. 7500-gal., incl. containment wall, access ladder, piping, etc. [C].

4. Item Reference #6076 from "Schedule One to Trustee's Bill of Sale Spreadsheet," being skimmer system, installed in lagoon, w/drive, pump, etc., incl. platform, electrics.

5. Item Reference #6077 from "Schedule One to Trustee's Bill of Sale Spreadsheet," being storage tank, used oil, located near lagoon, approx. 15000-gal., carbon steel, horiz., incl. pump, containment wall, access ladder, etc., asstd. auxiliary houses, pump house, etc.

ATTACHMENT 5 - INVENTORY

By-product of manufacturing including but not limited to Kish and miscellaneous other materials and assorted scrap which are located on the real property purchased by Purchaser from Seller by deed of even date herewith.

The option for Purchaser herein to take title to such portion or all of such items shall be exercisable by Purchaser by its taking actual physical possession of such items or otherwise evidencing its intent to be the owner thereof.

With respect to any such by-products or other items which are not located on the real property purchased by Purchaser by deed of even date herewith, by on other property of Seller retained by Seller (hereinafter the "Retained Property"), Purchaser shall have an option to take title to such portion or all of such items, which option shall be exercisable by Purchaser by its taking actual physical possession of such by-products or other items and removing same from the Retained Property, its successors or assigns.

Purchaser shall be vested with title to such items at such time as they are physically removed from the said Retained Property, and if not removed by Purchaser from said Retained Property, shall remain the property of Seller. Purchaser shall have ten (10) years from the date of this Bill of Sale to exercise its rights to take title hereunder, and after such period, any items not removed from the Retained Property shall remain the property of Seller and Purchaser shall have no further rights with respect to same.

## END OF DESCRIPTION